## ALICE McSHERRY v. CITY OF ST. PAUL.[1]

February 4, 1938.

No. 31,499.

[1]Reported in 277 N. W. 541.

*John W. McConneloug* and *Hilary J. Flynn,* for appellant.

*Oscar Hallam* and *Herbert E. Wolner,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff, claiming right of tenure under the teachers' tenure law (L. 1927, c. 36, 1 Mason Minn. St. 1927, §§ 2935-1 to 2935-14), brought this action to recover a claimed balance due her for salary as a teacher in the St. Paul public schools. Tried to the court, findings were made in her favor. Defendant appeals from an order denying its alternative motion for amended findings or a new trial.

Plaintiff, a graduate of the advanced course of Mankato Teachers College, in 1915 received a life certificate from that institution, having theretofore successfully completed two years of teaching. Although she later taught many years in the St. Paul schools prior to 1930, her claim of tenure is based on employment from and after September, 1930. At that time she was engaged as a "supply substitute" to teach sixth grade. As such she taught continuously, with the exception of a week in November, 1930, during which time she could not teach because of changes being made in the schoolroom, up to January 29, 1933, at which time she was summarily discharged. Her service period thus constituted a span of two and one-half school years. Thereafter, as a "casual substitute," she taught somewhat intermittently but nevertheless with substantial continuity, at various schools in St. Paul, until June, 1935. From January 29, 1933, to June of that year, she lost only 18 days of actual work. In the school years 1933-1934 and 1934-1935, she lost more of her teaching time, but her employment was substantial and reasonably continuous, considering that she was classified as a "casual substitute." She reported for work daily, and no teaching time was lost because of inefficiency or lack of willingness on her part to serve. The record does not disclose that she at any time was under a periodic contract, written or oral. The closest ap-

proach thereto was in August, 1932, when she received a letter assigning her to "supply substitute" work for the "coming term."

Defendant has followed the practice of classifying its teachers into three groups: (1) Regulars, (2) Supply Substitutes, and (3) Casual Substitutes. "Regulars" are given single assignments for definite periods; "supply substitutes" are generally employed to take over the work of regular teachers over somewhat long intervals, usually a semester or more; and "casual substitutes" are, as that label indicates, substitutes subject to call for service at any time and for any school in the city. They usually work short periods, a few days to several weeks, depending upon the particular circumstances and requirements presented from time to time.

1 Mason Minn. St. 1927, § 2935-1, defines "teacher" to mean "every person regularly employed, as a principal, or to give instructions in a classroom, or to superintend or supervise classroom instruction, or as a placement teacher and visiting teacher." Other pertinent sections read as follows:

"§ 2935-4. All teachers in the public schools in cities of the first class in the state during the first three years of consecutive employment shall be deemed to be in a probationary period of employment during which period any annual contract with any teacher may, or may not be, renewed as the school board or commissioner shall see fit. The school board or commissioner may during such probationary period discharge or demote a teacher for any of the causes as specified in Section 6. A written statement of the cause of such discharge or demotion shall be given to the teacher by the school board or commissioner at least 30 days before such removal or demotion shall become effective, and the teacher so notified shall have no right of appeal therefrom.

"§ 2935-5. After the completion of such probationary period, without discharge, such teachers as are thereupon re-employed shall continue in service and hold their respective position during good behavior and efficient and competent service and shall not be discharged or demoted except for one or more of the causes as specified

in Section 6, and after a hearing as specified and provided in Section 7.

"§ 2935-6. Causes for the discharge or demotion of a teacher either during or after the probationary period shall be:

"(a) Immoral character, conduct unbecoming a teacher or insubordination.

"(b) Failure without justifiable cause to teach without first securing the written release of the school board or commissioner having the care, management or control of the school in which the teacher is employed.

"(c) Inefficiency in teaching or in the management of a school.

"(d) Affliction with active tuberculosis or other communicable disease shall be considered as cause for removal or suspension while the teacher is suffering from such disability.

"(e) On account of discontinuance of position or lack of pupils."

The record leaves no doubt that plaintiff was in fact a "teacher" within the meaning of the act and was so engaged and so recognized by defendant. The question then simmers down to whether she was employed by defendant a sufficient length of time to bring her within the tenure provided by the act. Before that question is taken up let us briefly look back into the past to see if there is anything therein to help us in finding a solution to the problem. In other words, what is the background of our tenure act? What were the reasons for its enactment? What was it intended to accomplish?

The education of our youth to fit them for the duties and responsibilities of citizenship in our state and nation was a matter of vital concern to our pioneers. This seems clear as we find that immediately upon statehood constitutional provision was made to accomplish that end. By art. 8, §§ 1 to 7, inclusive thereof, provision was made for the establishment and maintenance of public education as a state system under its direction and control. Thus § 1 provides: "The stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the legislature to establish a general and uniform sys-

tem of public schools." Subsequent sections provide for the sale and disposition of lands theretofore or thereafter acquired by the state from the United States; the use of the proceeds to be derived from such sales; the creation of a perpetual school fund to remain forever inviolate with income alone to be used; for the enactment of legislation to support "by taxation or otherwise, as, with the income arising from the school fund, will secure a thorough and efficient system of public schools in each township in the state."

Teachers' tenure, like civil service and other similar movements, dates back now over a period of many years. The abuses existing by reason of the "spoils system" which came into prominence during Jackson's administration, later followed by national and other administrations, led to much deserved criticism. That is why on January 16, 1883 ("An act to regulate and improve the civil service of the United States," 22 St. 403) the first civil service act was passed. In 1885 the National Education Association brought forth the question of tenure of school officials. A committee of that association studied the matter and later submitted a report. Generally speaking, the tenure so sought was interpreted to mean, in substance, the application of the principles of civil service to the teaching profession. It was thought that for the good of the schools and the general public the profession should be made independent of personal or political influence and made free from the malignant power of spoils and patronage. In 1886 the state of Massachusetts enacted a law "relating to the tenure of office of teachers." Thereunder school districts were permitted to enter into contracts with teachers for a longer period than one year. In 1889 the committee on rules of the Boston School Committee suggested a tenure law providing for a probationary period of one year, four years of annual elections, and thereafter permanent tenure subject to removal for cause after proper hearing. The bases for recommendations were that better talent would be attracted to the teaching profession; that annual contracts theretofore in vogue had not resulted in the elimination of poor, incompetent, and inefficient teachers; that the principle of annual election or appointment was not generally applied to policemen, firemen, or judicial officers, and in the

very nature of things should not apply to teachers; that not infrequently the best teachers were discharged for inadequate reasons. (See report of Committee on Tenure of National Education Association for the year 1921.) Foreign countries have long recognized the principle of teachers' tenure. (See report of Committee on Tenure of National Education Association for the year 1936.) Since 1900 the principle of teachers' tenure in this country has developed more rapidly. In a general way it has followed the civil service plan. The objectives sought have been to protect the teachers against unjust removal after having undergone an adequate probationary period; that the movement itself has for its basis public interest in that most advantages go to the youth of the land and to the schools themselves, rather than the interest of the teachers as such. (See report of Committee on Civil Service for Teachers of National Education Association for July, 1934.)

Many states have adopted teachers' tenure acts. We shall not stop to enumerate them. The general purposes and advantages of these acts and the reasons therefor are interestingly set forth in "Bulletin of National Education Association on Teachers' Tenure for 1937."

We refrain from making further comment on this phase, as every citizen knows and recognizes, not only as a matter of history but also as a matter of personal experience, the great importance our schools have played and are playing in the furtherance of good citizenship by affording, generally and to all our youth, opportunity to gain an education. Properly and appropriately the legislature has from time to time enacted laws to make our educational system one of state-wide application. Classification and provision for maintaining the various types of schools and other institutions of learning have been made and are being enforced. And so it has been generally recognized that "school districts are governmental agencies subject to the control of the legislature"; that "their powers and privileges may be changed or abrogated by the legislature as it may see fit. Their boundaries or territorial jurisdictions may be enlarged, diminished or abolished in such manner and through such instrumentalities as the legislature may prescribe";

that they are, "as quasi municipal corporations, and for the purposes for which they are created, coördinate with and not subordinate to the counties in which they are situated." 5 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 8662, and cases cited under notes.

Plainly, the legislative purposes sought were stability, certainty, and permanency of employment on the part of those who had shown by educational attainment and by probationary trial their fitness for the teaching profession. By statutory direction and limitation there is provided means of prevention of *arbitrary* demotions or discharges by school authorities. The history behind the act justifies the view that the vicissitudes to which teachers had in the past been subjected were to be done away with or at least minimized. It was enacted for the *benefit and advantage of the school system* by providing such machinery as would tend to minimize the part that malice, political or partisan trends, or caprice might play. It established *merit* as the essential basis for the *right* of permanent employment. On the other hand, it is equally clear that the act does not impair *discretionary* power of school authorities to make the best selections consonant with the public good; but their conduct in this behalf is strictly circumscribed and must be kept within the boundaries of the act. The provision for a probationary period is intended for that very purpose. The right to demote or discharge provides remedies for safeguarding the future against incompetence, insubordination, and other grounds stated in the act. The act itself bespeaks the intent. Provisions for notice and hearing, the requirements of specified causes for discharge or demotion, are indicative of the general purpose. With these considerations in mind, it is our duty so to construe such parts of the act which on their face do not clearly delineate the legislative intent as will bring about a result in harmony with the expressed legislative policy.

■ It is urged in defendant's behalf that 1 Mason Minn. St. 1927, § 2935-1, does not include "substitute" teachers, but only those given regular appointments. This, so the argument goes, means continuous employment from the standpoint of actual time spent by the teacher in her classroom. With that we do not agree. True, the

term "regularly employed" appearing in the mentioned section might be so construed when taken singly and alone. (See 53 C. J. pp. 1168, 1170, and cases cited.) But we are required to take a broad view of the entire act. By so doing we think that literal continuity of work or service is not the real test here applicable. The basic reasons for this legislative mandate and the policy it seems to serve lead to the conclusion that "substitutes" are as much teachers in the school system as those who receive "regular" appointments. They are required in every case, as a prerequisite to substitute work, to have the same qualifications as the "regulars." They cannot teach at all unless they are "qualified" and produce certificates to that effect. 1 Mason Minn. St. 1927, §§ 2900-2901.

The word "regular" is defined to mean that which is "arranged, * * * symmetrical; * * * steady * * * uniform; * * * not subject to unexplained or irrational variation; * * *" that which is "orderly; methodical." Webster's New International Dictionary (2d) 1935, p. 2099. 53 C. J. p. 1168. "The word 'regularly' is defined as meaning, in a regular manner; in a way or method accordant to rule or established mode; in uniform order; methodically; in due order; and such is the signification attached to the word in its common and ordinary use." City of Belleville v. Citizens' Horse Ry. Co. 152 Ill. 171, 183, 38 N. E. 584, 587, 26 L. R. A. 681. See also 7 Wd. & Phr. (1 ser.) p. 6035, et seq.

Determination of what is "casual" employment as distinguished from that which is regarded as "regular" has been made in compensation cases.

"The question whether an employment is casual must be determined with principal reference to the scope and purpose of the hiring rather than with sole regard to the duration and regularity of the service. * * * When there is a continuing engagement to serve the employer in his business at such times as the particular and essential service may be needed, the employment is not 'casual' according to any of the judicial definitions of that term." State Accident Fund v. Jacobs, 134 Md. 133, 135, 106 A. 255.

110

And as to whether the employment was casual or regular "depends upon the nature of the service rendered by the employe and not upon duration or frequency of his employment." Millard County v. Industrial Comm. 62 Utah, 46, 50, 217 P. 974, 976, citing Utah Copper Co. v. Industrial Comm. 57 Utah, 118, 193 P. 24, 13 A. L. R. 1367.

Plaintiff's *employment* was as *regular* as that of any of the *regular* teachers, but *rendering the service,* as to time and place, was not. She had to keep herself in constant and immediate readiness to go to any school when and as called upon so to do by the school authorities. The very nature of her work was such that she could take no other job. The record bespeaks her availability at all times, and that defendant made use of her services with substantial continuity cannot be denied.

■ The right of tenure under our act does not attach until after three years' probationary service, at the end of which the teacher is reëmployed. Defendant urges that *consecutive* employment is lacking. Plaintiff rendered service as a teacher from September, 1930, until and including the school year 1934-1935. True, her position as a supply substitute was sought to be brought to an end January 29, 1933; but no written notice or charges of any kind were made. The court found that the attempted discharge was ineffective because of failure to comply with the statute. § 2935-4. In this the court was clearly right. From then on she continued her work as a casual substitute. Her status as to service remained that of a teacher, an employe of defendant. The mere label "casual" as distinguished from "supply" substitute is unimportant. The statute defines plaintiff's position, *i. e.,* "teacher" means "every person regularly employed * * * as a placement teacher and visiting teacher." No such classification as was attempted by defendant is therein recognized. Neither the classification nor the attempted discharge for the obvious purpose of interrupting her tenure rights is effective. The court so found, and that finding is amply sustained. In Hosford v. Minneapolis Board of Education, 200 Minn. 1, 7, 275 N. W. 81, 84, tenure rights were sought to be interrupted by taking from the teacher a so-called resignation. It was held

to be ineffective because the "resignation" was "in circumvention of the teachers' tenure law" and as such "void." The same principle applies here.

The lack of consecutive employment claimed by defendant is something that inhered in the nature of plaintiff's employment. She was, as we have seen, an employe at all times here involved, and her employment was that of a teacher, nothing else. To say that a day's layoff, or even several, would break her service insofar as continuity is concerned is to nullify the very existence of any probationary period. Defendant recognized her statutory rights but sought to nullify them by a discharge which, under the act, was wholly insufficient. The actual situation refutes defendant's claims; and to adopt its interpretation of the statute would in effect, upon the facts here appearing, do away with it entirely.

The reasoning used by the court in State ex rel. Clark v. Stout, 206 Ind. 58, 64-65, 187 N. E. 267, 269, is applicable here:

"But in our opinion the Teacher Tenure Act is based upon the public policy of protecting the educational interests of the state and not upon a policy of granting special privileges to teachers as a class or as individuals. Consequently it should not be strictly construed as against relator but rather should be construed liberally to effect the general purpose of the Tenure Act since it is 'legislation in which the public at large are interested.'"

In School City of Evansville v. Culver, 94 Ind. App. 692, 696, 182 N. E. 270, 271, the court quoted from one of its prior decisions as follows:

"'Where the statute specifically enumerates the causes for which a teacher may be removed or dismissed, the teacher cannot be removed or dismissed for any other cause,' (citing cases), 'and, where the school board in removing or dismissing the teacher acted outside of its jurisdiction or power under the statute, the action of the board is not final, but is subject to the review of the courts,' (citing cases)."

■ It seems equally clear that plaintiff was reëmployed after having rendered the required three years of probationary service.

On September 14, 1933, she was sent to the Linwood school. She continued to teach, as we have said, until the end of the 1934-1935 school year. No notice such as is required by the statute was ever given. The mere fact that there was no annual contract, such as the statute apparently contemplates, should not be construed to mean that a teacher, who has served as long and as faithfully as plaintiff, should be deprived of clearly given statutory rights.

In reaching the same conclusion as did the trial court, we are but giving "effect to the obvious legislative intent." 6 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1937) §§ 8937 and 8937a, and cases under notes. See also *Id.* (Supps. 1932, 1934, 1937) §§ 8940 and 8951, and cases under notes.

Late cases bearing upon this subject are listed and comments made in "Court Decisions on Teacher Tenure," National Education Association for the years 1935, 1936, and 1937. Also helpful to any student of the problem are 20 Minn. L. Rev. 721, on "Removal from Public Office in Minnesota," by Professor Edward G. Jennings, and particularly pp. 762 to 769, inclusive, under the title "Teachers' Tenure"; Research Bulletin of the National Education Association, Vol. II, No. 5, November, 1924, and Vol. XIV, No. 4, September, 1936; Report of the Committee of One Hundred on Tenure Problems of the National Education Association, June, 1932, and the Status of Teacher Tenure (tentative form) September, 1937.

The laws in the various states are not in complete harmony nor are court decisions. But we think the general trend is in the direction of the result here reached.

We do not understand that the *amount* of plaintiff's recovery is involved. Rather, and only, the *right* of recovery is the issue.

The order is affirmed.