Arlene EVERETT, Plaintiff-Appellant,

v.

BOARD OF EDUCATION OF the HAMP-TON COMMUNITY SCHOOL DIS-TRICT and the Hampton Community School District, Defendants-Appellees.

No. 2-68339.

Court of Appeals of Iowa.

April 8, 1983.

James L. Sayre and Becky S. Knutson of Dreher, Wilson, Adams, Jensen, Sayre & Gribble, Des Moines, for plaintiff-appellant.

C.W. McManigal of Laird, Burington, Bo-vard, Heiny, McManigal & Walters, Mason City, for defendants-appellees.

SNELL, Judge.

Plaintiff appeals from district court deci-sion on judicial review affirming termina-tion of her teaching contract, asserting that the evidence does not support the conclu-sion that just cause existed for termination. We affirm.

On March 19, 1981, the superintendent of Hampton Community School District caused to be served upon plaintiff Arlene Everett a notice and recommendation to terminate her teaching contract, pursuant to Iowa Code section 279.15 (1983). The notice and recommendation listed the fol-lowing reasons as just cause for plaintiff's termination: unsatisfactory performance, failure to meet district standards, unsuita-ble teaching methods, inability to motivate students, and persistent failure to provide the type of teacher-directed responses, ac-tivities, and reinforcement techniques for students to make satisfactory progress to acquire basic skills and develop a positive self-concept. Plaintiff had been employed by the Hampton District as a fifth grade teacher for eleven consecutive school years and was therefore considered a nonproba-tionary teacher. Plaintiff requested a pri-vate hearing pursuant to section 279.15, which was granted. On May 4, 1981, the Board of Directors rendered its decision ter-minating plaintiff's employment. This de-cision was affirmed both on plaintiff's ap-peal to an adjudicator, pursuant to section 279.17, and to the district court, pursuant to

section 279.18. Plaintiff then filed this further appeal.

■ Our task on appeal is to make anew the determination of the district court based on seven grounds for review listed in Iowa Code section 279.18. *Smith v. Board of Education,* 293 N.W.2d 221, 223 (Iowa 1980); *Board of Education v. Youel,* 282 N.W.2d 677, 679 (Iowa 1979). This section provides, in material part:

In proceedings for judicial review of the adjudicator's decision, the court shall not hear any further evidence but shall hear the case upon the certified record. In such judicial review, especially when considering the credibility of witnesses, the court shall give weight to the fact findings of the board; but shall not be bound by them. The court may affirm the adjudicator's decision or remand to the adjudicator or the board for further proceedings upon conditions determined by the court. The court shall reverse, modify, or grant any other appropriate relief from the board decision or the adjudicator's decision equitable or legal and including declaratory relief if substantial rights of the petitioner have been prejudiced because the action is:

1. In violation of constitutional or statutory provisions; or

2. In excess of the statutory authority of the board or the adjudicator; or

3. In violation of a board rule or policy or contract; or

4. Made upon unlawful procedure; or

5. Affected by other error of law; or

6. Unsupported by a preponderance of the competent evidence in the record made before the board and the adjudicator when that record is viewed as a whole; or

7. Unreasonable, arbitrary or capricious or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.

Our review, as was the evidence presented to the school board, is "limited to the specific reasons stated in the superintendent's notice of recommendation of termination." Iowa Code § 279.16; *Smith,* 293 N.W.2d at 225. We therefore must consider these allegations in determining whether affirmance, reversal, or some other disposition is appropriate. In doing so, although we give weight to the fact findings of the board, we are not bound by them. Iowa Code § 279.-18.

■ Plaintiff's sole contention on appeal is that the decisions of the board and the adjudicator that just cause existed to terminate her contract were unsupported by a preponderance of the competent evidence in the record. While we are limited to the reasons stated in the superintendent's recommendation in making our independent determination of whether just cause to terminate existed, it is not necessary that each allegation constitute just cause in and of itself; rather, we consider all of the allegations as a whole to determine whether the just cause requirement is satisfied. *See Board of Education v. Youel,* 282 N.W.2d 677, 682 (Iowa 1979).

"Just cause" has been defined as conduct:

which directly or indirectly significantly and adversely affects what must be the ultimate goal of every school system: high quality education for the district's students. It relates to job performance including leadership and role model effectiveness. It must include the concept that a school district is not married to mediocrity but may dismiss personnel who are neither performing high quality work nor improving in performance.

*Wedergren v. Board of Directors,* 307 N.W.2d 12, 20 (Iowa 1981) (quoting *Briggs v. Board of Directors,* 282 N.W.2d 740, 743 (Iowa 1979)). The concept is a flexible one; each case "depends on its own circumstances." *Id.* at 20.

In this case the superintendent, principal, and director of elementary education all testified that throughout a period of approximately eight years they had been concerned about plaintiff's "negative reinforcement" of students, her sarcasm and ridicule of students and her lack of rapport with parents. These concerns arose after formal evaluations, informal observations of plain-

tiff in the classroom, numerous parental complaints about plaintiff's treatment of students and requests that children not be placed in her classroom, and incidents related by students. At various times throughout this approximate eight-year period, each of these individuals has discussed these problems with plaintiff.

The evidence submitted by the district details several incidents regarding these problems. Specifically, prior to the start of the 1974–75 school year and each school year thereafter several parents contacted the superintendent stating that they did not want their children assigned to plaintiff's classroom because of the "pressure" she used in motivating students. In November 1974, three parents told the superintendent that their children had felt pressure in plaintiff's classroom and were fearful of being reprimanded in front of the class if they did not complete assignments. Many parents complained about the excessive amount of homework. Other parents told the superintendent that their children, who had always previously enjoyed school, were trying to avoid going to school during the year they were assigned to Mrs. Everett's classroom. One child developed emotional problems and received counseling with the school psychologist. Another child became a habitual bed wetter, a problem which existed at no time prior to or since the year she was assigned to Mrs. Everett's classroom. A student who mispronounced a word was required to repeat the word in front of the class until he pronounced it correctly—it took him twenty times. Finally, among the parents who specifically requested that their children not be placed in plaintiff's classroom were fellow teachers in the school system. The superintendent discussed each of these incidents with plaintiff, stressed the importance of providing positive rather than negative reinforcement to children, and made suggestions as to how plaintiff could prevent such incidents in the future and improve her effectiveness.

During the 1976–77 school year a needs assessment was conducted with the participation of students, board members, faculty and citizens to develop goals and objectives for the school system. The primary goal established as a result of this needs assessment was to develop in students a positive self-concept. Teaching materials were developed, preschool workshops were conducted, and teachers were directed to actively work toward the building of students' self-concepts. Notwithstanding this school-wide program, the superintendent testified that he observed plaintiff using sarcasm and ridicule in dealing with students, and that he continued to receive numerous complaints from parents. The formal evaluations of plaintiff completed in February 1980 and February 1981 indicate the need for improvement in these areas.

■ Although the record contains conflicting testimony regarding some of these problems, including testimony by twelve parents that their children respect plaintiff and made satisfactory progress when she was their teacher, affidavits by fifteen additional parents expressing a favorable impression of plaintiff, and a dispute regarding notice to plaintiff that her performance was unsatisfactory, this testimony must be considered in light of the demeanor of the witnesses who presented it. In this regard we give weight to the judgment and the fact findings of the board. Iowa Code § 279.18. We agree with the adjudicator that

> given the specificity of the charges against [plaintiff] together wit her apparent failure to improve notwithstanding repeated notices and assistance, the likelihood of reoccurrences of such incidents, and the significant and adverse psychological and emotional effect such "negative" conduct has on elementary school age children, the greater weight must be accorded the District's evidence.

Although the burden of proving just cause is on the superintendent, plaintiff must, like any appellant, demonstrate error in the decision below in order to succeed on appeal. *See Board of Education v. Youel,* 282 N.W.2d 677, 680 (Iowa 1979). We do not think plaintiff has done so. We conclude that the decisions of the board and the

adjudicator to terminate plaintiff's employment contract were supported by a "preponderance of the competent evidence in the record ... when that record is viewed as a whole," and therefore affirm the district court's decision.

AFFIRMED.

All Judges concur except OXBERGER, C.J., and JOHNSON, J., who dissent.

OXBERGER, Chief Judge (dissenting).

I respectfully dissent.

The majority focuses almost exclusively upon those aspects of the record which tended to support the position of the school administration. However, the evidence on the other side, although it is acknowledged by the majority, strikes me as being overwhelming.

In this appeal at law, we review the whole record, according to the weight to the Board's findings as measured by the seven statutory grounds upon which relief may be granted. Iowa Code § 279.18 (1983); *Board of Education of Fort Madison Community School District v. Youel,* 282 N.W.2d 677, 679–80, 684 (Iowa 1979).

The record contains a number of evaluations of the plaintiff's performance made by principals under whom she had worked in the Hampton Community School District over a period of eleven consecutive school years. All of these evaluations (insofar as they are in the record before us) up to 1980 were more than satisfactory. A summary of her administrative evaluations for the school years 1974 through 1981 reveals that in each of the years prior to 1980 she received satisfactory or outstanding evaluations in each of the seventeen areas covered. During those years, she received an evaluation of "improvement needed" only once, in 1974, with regard to her relationship to parents. On the following evaluation, dated 1976, her performance in that area was marked "satisfactory," and the evaluator wrote, "You have shown growth in your ability to gain the confidence of the parents. Keep working on it." In 1977, another evaluator noted that she "uses many supplemental materials and techniques to reinforce concepts," and that she was "showing growth in making provision for individual needs and weaknesses." Keith Sersland, the principal who eventually recommended her termination, evaluated her performance in 1978. Her overall performance was rated by Mr. Sersland as satisfactory. He checked lines on the form which said, with regard to parents, that she "communicates with understanding and tact," "interprets school policies and practices in a positive manner," "willingly seeks to confer with parents," and "has difficulty establishing rapport with parents." He wrote the following comment: "I do feel you are working to improve your communications with parents, especially in a more positive manner." Mr. Sersland rated her initiative and enthusiasm as "outstanding," and said that she "does more than is expected," "arouses enthusiasm in students and colleagues," is "creative in solving problems, has experimental attitude," and wrote that she was "always eager to try new methods and materials." Mr. Sersland also rated her voice, diction, and usage, her professionalism, her knowledge of her subject, and her use of various instructional techniques and methods as outstanding. In all other respects, she was found by Mr. Sersland to be satisfactory. Mr. Sersland found that her motivation of students was satisfactory, and that she was "highly enthusiastic, incorporating student ideas and developing pride in achievement," "occasionally uses new ideas to motivate students," "strives to motivate every student to achieve to his maximum ability," "uses numerous innovative practices to stimulate learning," and "stimulates student interest and effort." He wrote that there were "always lots of extra things in the room for students to look over and enjoy." Mr. Sersland found that her sensitivity to individual differences was satisfactory, noting that she showed insight into the developmental levels of all students, that she knew the individual strengths and weaknesses of each student, that she recognized learning disabilities and provided for individual differences. He commented: "You continue to

provide more individual educational activities. Hope you continue to improve in this area."

Mr. Sersland's evaluation in 1979 was basically the same. He again found that she communicated with parents with understanding and tact, that she interpreted school policies and practices in a positive manner, and that she willingly sought to confer with parents. Her responsibility and reliability were found by Mr. Sersland to be outstanding as were her initiative and enthusiasm, her voice, diction, and usage, her professionalism, and her knowledge of the subject. With regard to motivation of students, Mr. Sersland continued to find that she was enthusiastic, that she incorporated student ideas into their work and helped to develop pride in their achievements, that she used new ideas to motivate them, that she was striving to motivate every student to achieve to his maximum ability, that she used numerous innovative practices to stimulate learning, and that she stimulated student interest and effort. Mr. Sersland continued to find that she was sensitive to individual differences among the students, and commented favorably upon her instructional techniques and methods. He noted that she was very thorough in her evaluations of students, and he had not a single negative comment to make about the plaintiff or her methods.

In 1980, Mr. Sersland's evaluations suddenly took a turn for the worse. He found that the plaintiff was not outstanding in any area. She needed improvement in a number of areas, even in her "voice, diction, and usage," where he found that she had to "use a milder vocal tone when leading class discussions," whereas in prior years, he had found that she was outstanding in this area, and had commented that her mastery of this area was a "strong tool in the classroom." Mr. Sersland complained, in his evaluations of the plaintiff, that she relied too heavily on her own judgment of what was best for the student. The remainder of the evaluation follows the same pattern.

The 1981 evaluation was even worse. The most revealing comment made by Mr.

Sersland was the following: "Your open criticism of new educational programs, students and administration has a very negative and demoralizing effect on fellow staff members." Mr. Sersland expressed dissatisfaction with the plaintiff's attitude toward the student self-concept program, and added: "Also, your criticism towards the training program and teaching of the new health program has been less than ideal." In addition, in commenting on her professionalism, Mr. Sersland wrote: "Your informing fellow teachers of confidential evaluations and meetings concerning your teaching methods as well as your criticisms of the administration, are acts of poor professional ethics."

The record contains numerous letters and notes from parents that are strongly supportive of the plaintiff. They indicate that at least some of her students thought that she was an excellent teacher. Some of the parents expressed a belief that her methods, though not identical with those of all other teachers in the school system, were nevertheless beneficial to their children. They indicated that the plaintiff had gone out of her way to contact them when their children were having problems, and that she was helpful in resolving those problems. One parent, whose daughter had a learning disability, expressed considerable satisfaction over the plaintiff's treatment of her daughter. She wrote:

I personally feel that if the parents of today would be more concerned with the *quality* of their children's education rather than whether the child thinks their teacher is really "great" because he or she plays the guitar or some such nonsensical thing, we would all be much better off.

Numerous parents expressed satisfaction over the fact that their children developed good study habits as a result of the plaintiff's teaching methods, and indicated that their children had flourished as a result of being in her class.

Reviewing the record as a whole, I cannot help but conclude that the plaintiff, who had eleven years of experience and had been evaluated as being satisfactory or out-

standing in every respect over all of those years by a number of different evaluators, including Mr. Sersland, could not have changed so radically between 1979 and 1980 as to deserve to be terminated. The comments made by Mr. Sersland on his evaluation of her work suggest that those evaluations may be motivated by his own pique at her criticisms of the philosophy of education which he evidently attempted to implement in the school rather than by any change in the plaintiff's performance in the classroom.

Teacher tenure is too important for us to run roughshod over it. It is vital, not only for the well-being of the teachers themselves, but for the schools and the general public that the teaching profession be insulated from personal or political influence and from the malignant power of arbitrary administrators or school boards. The establishment of tenure laws was motivated by a public perception that "not infrequently the best teachers were discharged for inadequate reasons." *McSherry v. City of St. Paul,* 202 Minn. 102, 277 N.W. 541, 544 (Minn.1938). The objective of a teacher tenure law is to protect teachers against unjust removal after they have undergone an adequate probationary period. This is not only for the protection of the teachers, but it is in the public interest, since it gives teachers a degree of security which they would not otherwise have and provides for continuity of the educational programs of the community. "It was enacted for the *benefit and advantage of the school system,* by providing such machinery as would tend to minimize the part that malice, political or partisan trends, or caprice might play. It established *merit* as the essential basis for the *right* of permanent employment." *Id.,* 277 N.W. at 544, emphasis in original.

*Schulz v. Board of Education,* 315 N.W.2d 633 (Neb.1982) is virtually identical with the instant case. There, too, a tenured teacher was terminated on the ground that she was allegedly incompetent. Her performance evaluation records from at least 1974 through 1980 indicated average or above average or superior performance in almost every category. From time to time,

she apparently failed to receive complete approval from some of her students' parents. The court noted that she seemed to be a teacher "who is serious and devoted to her teaching, though, because of an introverted personality, she does not smile as much as she might." Her students, like those of the plaintiff in the instant case, complained that they had too much homework. As in the instant case, in which one parent complained that her child suffered from sleeplessness as a result of his contacts with the plaintiff, several parents in *Schulz* testified that their children became ill or suffered from nerves because of Mrs. Schulz's teaching methods, but none of their claims were supported by any medical testimony. The court in *Schulz* held that "before a tenured teacher may now be terminated, the school board must meet its burden of establishing, as a matter of law, the existence of just cause, which, as defined by the statute, is more than dissatisfaction by school board members or parents." *Id.* at 637.

More to the point, the court in *Schulz* concluded:

There is little doubt that Mrs. Schulz might do herself a favor by being less rigid. As Mr. Bechtel [her principal] testified, Mrs. Schulz is "an old-fashioned teacher." Perhaps such teachers do not win popularity contests, but neither can they be said to be incompetent. Teachers are not required to entertain their students, only to teach them.

*Id.* at 638.

I agree. It is clear to me that the superintendent in the instant case has not met his burden of proving that the plaintiff was terminated for just cause. A preponderance of the evidence in the record does not establish that there was just cause for terminating her contract. Rather, the opposite is the case. There is ample evidence that the plaintiff is a highly competent, professional teacher who is deeply concerned for the education of the students who are placed in her charge. It is precisely for such teachers that the legislature

enacted those provisions of Iowa Code sections 279.13–279.19 (1983) which conferred tenure upon teachers in this state. *See Bruton v. Ames Community School District,* 291 N.W.2d 351 (Iowa 1980).

The evidence in the record clearly points to the conclusion that the plaintiff is being punished by loss of her livelihood for her disagreement with the principal's educational philosophy and her expression of such disagreement. Teachers do not lose their first amendment right of free expression when they undertake to educate our children. Moreover, even teachers in elementary schools are entitled to a reasonable degree of respect for their professionalism.

With respect to the academic freedom of teachers of high school students..., federal courts dealing with the subject have upheld two kinds of academic freedom: The substantive right of a teacher to choose a teaching method which in the court's view served a demonstrated educational purpose; and the procedural right of a teacher not to be discharged for the use of a teaching method which was not proscribed by a regulation, and as to which it was not shown that the teacher should have had notice that its use was prohibited.

*Webb v. Lake Mills Community School District,* 344 F.Supp. 791, 799 (N.D.Iowa 1972).

Although this opinion was directed to a case having to do with high school students, the court noted that "the rationale must extend to high school and even elementary teachers." *Id.* To be sure, the state interest in limiting the discretion of teachers grows stronger as the age of the students decreases, and teachers of younger students do not have the same "academic freedom" that teachers of college students or even high school students enjoy, but there can be no doubt that even in elementary schools, teachers are entitled to a degree of freedom of expression which must include reasonable flexibility in teaching methods. They ought not to be required to adhere rigidly to methods prescribed by each principal over a lifetime of service. We should take judicial notice of the fact that educational doctrines are subject to almost as many vicissitudes as are the fashions in the women's garment industry, moving unpredictably from rote memorization to the theory that we should educate the "whole child"; from learning by doing to learning centers and modules; from emphasis on the three R's and rigid discipline to experimentation with new curricula and "positive reinforcement."

The legislature has recognized the professional status of the teachers of this state. Experienced teachers who have achieved tenure and have successfully educated a generation of our young citizens should not be subject to dismissal simply because they are applying teaching methods that have fallen out of fashion in the eyes of a new principal.

The defendants have not met their burden of proof. I would reverse and reinstate the plaintiff in her position.

JOHNSON, J., joins this dissent.