**In the Matter of Robert FITZGERALD, Appellant,**

v.

**SAYDEL CONSOLIDATED SCHOOL DISTRICT, Appellee.**

No. 88–180.

Supreme Court of Iowa.

Feb. 15, 1984.

James L. Sayre and Becky S. Knutson of Sayre & Gribble, P.C., Des Moines, for appellant.

Edward W. Remsburg of Ahlers, Cooney, Dorweiler, Haynie, Smith & Albee, Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and UHLENHOPP, HARRIS, McCORMICK, and WOLLE, JJ.

UHLENHOPP, Justice.

This appeal involves interpretation of contract termination provisions relating to teachers in sections 279.13 to .19 and section 279.27 of the Iowa Code (1979) (referred to as "the sections"). In brief, the sections provide that a nonprobationary teacher's contract automatically renews unless it is terminated for just cause in accordance with specified procedures or the teacher is discharged during the contract year for just cause.

Defendant Saydel Consolidated School District (district) maintains a special education program. Plaintiff Robert E. Fitzgerald was certificated to teach kindergarten through eighth grade and had three years teaching experience in another school. He was not certificated in special education. He had applied to the district for regular employment as a teacher, and had been placed on its temporary substitute list.

Gretchen Gilliam, one of the district's special education teachers, resigned during the school year 1979–1980. The district tried to find a certificated special education teacher to fill the vacancy, and in January 1980 employed Fitzgerald at $38 per day to teach until such a teacher could be located. At the end of eighteen days a properly certificated teacher had not yet been found. The district then had Linda Wickman, one of its own properly certificated teachers, take over the room where Fitzgerald was teaching, and had Fitzgerald take over Wickman's less difficult special education room. To retain Fitzgerald in the special education position until the end of the year the district had to obtain special permission from the State Department of Public Instruction, which it did. Wayne Davenport, district curriculum director now retired, testified:

Q. Would you describe the extent of your involvement? A. We had a resignation in the Learning Disabilities Program. We needed a substitute teacher to fill a classroom shortly after the Christmas vacation. Mr. Fitzgerald indicated on our temporary substitute list that he was available for substitute teaching. As is our custom, the principal and the assistant principal, in this case Woodside, contacted Mr. Fitzgerald to fill in this empty classroom on a day-by-day basis until further arrangements could be made while we searched for a qualified, properly approved teacher.

. . . .

Q. For the remainder of the school year? A. At that time we were looking for a teacher, qualified teacher, to take the job for the rest of the year, yes.

Q. Did you subsequently decide upon Mr. Fitzgerald for that position? A. He served as a day-by-day substitute in the room that had the teacher vacancy while we searched for a teacher. In the meantime we developed a plan that we would move a qualified teacher from the learning disabilities' position into the SCNI

room where the vacant teacher was since the SCNI room was a tougher position to fill. And then we gained permission from the Department to use Mr. Fitzgerald in a substitute teacher role in the learning disabilities room vacated by Linda Wickam. She was removed from the LD position to the SCNI room. So there was a movement of teachers.

Q. So what you did, in essence, was transferred an existing staff person into the opening. And did you then offer Mr. Fitzgerald the position left open by that transfer? A. Since we had found no suitable replacement Mr. Marion contracted the Department. They said, "Since you have nothing better and found no qualified teacher, Mr. Fitzgerald can serve as a substitute teacher in the program until the end of the year."

Q. In both of the responses of the school district in the Request for Admissions and in the documents that have been supplied to us, we have been informed that Mr. Fitzgerld worked in the interim position for a period of eighteen days and thereafter for a period of seventy-seven days in the position that he assumed from Mrs. Wickam. Is that her name? A. Yes.

Q. Was that your recollection? A. That is right.

The school board then authorized Fitzgerald's employment for the rest of the school year—77 days from February 11, 1980, at $62.66 per day "with no contract."

Fitzgerald testified:

Q. When you were first hired on January 16th, when you actually began, how long did you believe you were going to be at the Saydel School District teaching in that position as a substitute? A. I was initially hired for one day and it was just a matter of—they needed me for the following day. And after the second day was when I learned that the teacher who I had replaced had resigned and they asked me. So after the second day that I had taught in that room they asked me to continue in that position until they could fill in.

Q. So you were still on a day-to-day basis until that position could be filled? A. Yes.

Q. Filled by whom? Why could you not have filled it? Did they tell you? A. I don't recall if they told me why they couldn't fill it. I assumed because they were looking for a qualified teacher.

Q. Did you have those necessary credentials or qualifications to teach in a LD room? A. No, I didn't.

Q. And do you today have those necessary qualifications? A. No, I don't.
. . . .

Q. After eighteen days you were then switched to a different position, were you not? A. Yes, I was.

Q. And what position were you switched to? A. I was switched to the LD resource room.

Q. That's still a position that requires some type of special credentials or endorsements? A. Yes.

Q. And did you have that? A. No.

Q. Was it explained to you why you were being put in that position? A. As it was explained to me, the teacher in the LD resource room requested a transfer to the position that I had initially came to Saydel in.

Q. And was that teacher's name Linda Wickam? A. Yes.

Q. So she switched over to the position that you started out? A. Yes.

Q. And you switched back to her old position? A. That's correct.

Q. Were you told how long you would remain in that position when you were switched? A. I believe when I was switched it was still on a day-to-day basis.

Q. Eventually you were told that you would remain in that position until the end of the school year? A. Yes.

Q. Were you ever told by anyone at the Saydel School District that you would have a position at the school district beyond June 6, 1980? A. No.

Q. Your rate of pay was increased effective February 11, 1980, was it not? A. Yes.

Q. And you worked then seventy-seven days at this new position? A. That's right.

On March 13, 1980, Superintendent Branstrator of the district wrote Fitzgerald as follows (Exhibit 8):

The 1979–80 school year is rapidly coming to an end. You probably have questions about future employment possibilities with the Saydel District for 1980–81.

I would like to review your status with us. You are presently teaching in an interim position which will end on June 6, 1980. You were given that information when you were employed. At this time I see no positions available to you for next year. Your application will be kept on file and you will be given consideration should staff changes occur. I suggest that you write this office a letter if you have an interest in future employment with us.

Your services for this year are greatly appreciated by your building principal and the district administration. I hope you are enjoying your classroom experience in Saydel.

Fitzgerald testified:

Q. Is Exhibit 8 a copy of the letter that you received from Superintendent Branstrator? A. Yes, it is.

Q. Did you receive that on or about March 13th or March 14th? A. Yes, I did.

Q. Of 1980? A. Yes.

Q. In the letter Superintendent Branstrator indicates that you are presently teaching in an interim position which will end on June 6, 1980. Do you disagree with that statement? A. No.

Q. And he says that you were given that information when you were employed. Do you disagree with that statement? A. No.

Q. And then he also indicates that he sees no positions available to you for next year at this time. Did you have any promises by the district then that you would have a position beyond June 6th of 1980? A. No.

Section 279.15 of the Code requires notice to a teacher by March 15th of the superintendent's intention to recommend termination of the teacher's employment at the end of the school year, with a statement of the reasons constituting just cause. Branstrator did not give this notice.

On March 26, 1980, the superintendent wrote Fitzgerald thus:

This letter is notification the Board of Education at its regular meeting, Monday, March 24, 1980, officially terminated your interim position with the Saydel School District effective June 6, 1980.

I again would like to express appreciation to you for your services to the students of the school district.

I have received your letter regarding future employment with the school district and it has been placed in the active file. Please keep this office informed regarding your continued interest in employment with the Saydel School District. If I can be of service to you in the future, please contact me at your convenience.

Section 279.16 permits the teacher to have a private hearing before the board concerning termination of employment at the end of the school year. Fitzgerald did not request such a hearing.

By letter Fitzgerald expressed interest in a special education position for the following year "contingent on my obtaining temporary certification through summer course work at Drake University." At trial he testified:

Q. Did you take the summer course work? A. No, I didn't.

Fitzgerald also wrote Davenport on May 15, 1984, about a coaching position the following year "if it would enhance my opportunity for employment in the Saydel School District"; he wrote again on June 5, 1980, stating, "I am still very interested in teaching in your school district and would appreciate it if your office would keep me posted on any teacher vacancies developing in the summer."; on June 14, 1979, he applied for an opening in fourth grade teaching of

which he had become aware; and on July 25, 1980, he applied for one of two open positions in fifth and sixth grades. The district did not employ Fitzgerald for the 1980–1981 school year; it sought and found a certificated special education teacher for that year.

Fitzgerald brought the present action against the district for a declaration that his employment as a "teacher" was not terminated in accordance with sections 279.13 to .19 of the Code and therefore automatically renewed for the 1980–1981 school year. The trial court entered judgment that Fitzgerald was a "temporary substitute teacher," that the sections cited did not apply to him, and that his employment ended June 6, 1980. Fitzgerald appealed.

The appeal presents two questions. Do sections 279.13 to .19 apply to temporary substitute teachers? Was Fitzgerald a temporary substitute teacher?

I. The sections do not expressly mention substitute teachers. We adverted to such teachers in *Bruton v. Ames Community School District*, 291 N.W.2d 351, 352 (Iowa 1980) ("Neither does the case involve ... a temporary substitute teacher."). In that case, however, we were dealing with a regular teacher and we did not have the problem now presented.

Minnesota has a statute which refers to substitute teachers. Minn.Stat.Ann. § 123.35(5) (West 1960) ("The board shall employ and contract with necessary qualified teachers and discharge the same for cause, but no substitute teacher shall be hired except to replace a regular teacher on leave of absence or in an emergency of less than one school year's duration."). The Minnesota Supreme Court recognized the classification of substitute teachers in *Hudson v. Independent School District No. 77*, 258 N.W.2d 594 (Minn.1977). *See also Minneapolis Federation of Teachers v. Minneapolis Special School District No. 1*, 270 N.W.2d 773 (Minn.1978). The court set forth the opposing considerations involved with teacher tenure statutes and substitute teachers in *Hudson*, 258 N.W.2d at 597,

quoting in part from *McSherry v. City of St. Paul*, 202 Minn. 102, 108, 277 N.W. 541, 544 (1938):

"Plainly, the legislative purposes sought were stability, certainty, and permanency of employment on the part of those who had shown by educational attainment and by probationary trial their fitness for the teaching profession."

Balanced against this legislative goal is the need to allow the school board enough latitude to administer effectively the operation of the public schools.

Decisions from other jurisdictions are not of great assistance as to whether the sections in question apply to substitute teachers; they involve tenure statutes which are more specific. The sections in question leave to the Iowa courts the task of filling the interstices. The decisions from elsewhere appear to hold generally, however, that temporary substitute teaching does not ripen into tenure. Cases include *Levy v. San Francisco Unified School*, 79 Cal. App.3d 953, 145 Cal.Rptr. 292 (1978); *American Federation of Teachers Local No. 1424 v. Board of Education of Monrovia Unified School District*, 77 Cal.App.3d 100, 143 Cal.Rptr. 264 (1977); *Santa Barbara Federation of Teachers Local 1081 v. Santa Barbara High School District*, 76 Cal.App.3d 223, 142 Cal.Rptr. 749 (1977); *Nester v. School Committee of Fall River*, 318 Mass. 538, 62 N.E.2d 664 (1945); *Driscoll v. Board of Education of City of Clifton*, 79 N.J. 126, 398 A.2d 90 (1979); *Gordon v. State Board of Education*, 132 N.J.L. 356, 40 A.2d 670 (1945); *Schultz v. State Board of Education*, 132 N.J.L. 345, 40 A.2d 663 (1945); *Ricca v. Board of Education of City of New York*, 47 N.Y.2d 385, 418 N.Y.S.2d 345, 391 N.E.2d 1322 (1979); *Taggart v. Multnomah County School District No. 1*, 96 Or. 422, 188 P. 1119 (1920); *Tyrone Area Education Ass'n v. Tyrone Area School District*, 24 Pa.Commw. 483, 356 A.2d 871 (1976).

Inevitably school districts must use substitute teachers in order to keep their schools in operation. The practicalities of operating a school system thus militate in

favor of the holding of the cited cases. For example, how could the Iowa statutory March 15th notice of recommended termination be given to a person who substitutes in April? Or take the extreme case of a substitute who works only three days in the year, while a regular teacher is ill at home. We do not think the General Assembly intended the administration must give such substitutes the March 15th notice or that the school board must, on demand, conduct a private hearing in compliance with the detailed steps of section 279.16.

Other provisions of section 279.13 reveal that the General Assembly had regular teachers in mind in the sections in question, not substitutes. Section 279.13 provides that teachers' contracts "shall state the number of contract days". Frequently this cannot be done with substitutes; the number of days is unknown. The section also requires contracts to state the "annual" compensation to be paid, but substitutes are not hired for the year, *Bruton*, 291 N.W.2d 351; this particular district pays substitutes by the day. Again, section 279.13 states that the contract "shall be signed by the president of the board when tendered, and after it is signed by the teacher, the contract shall be filed with the secretary of the board before the teacher enters into performance of the contract." Substitutes are sometimes called, however, only hours before the bell rings. Other clauses of the section provide that a board may not tender contracts to their employed teachers prior to March 15th and such teachers cannot be required to accept or resign less than twenty-one days after tender. Obviously the General Assembly was not referring to substitute teachers in any of these clauses.

■ We hold that the tenure provisions, sections 279.13 to .19, do not apply to temporary substitute teachers.

■ II. Was Fitzgerald a temporary substitute teacher? We know from *Bruton* that a teacher employed for the school year cannot be deprived of tenure as provided in the sections by a contract clause that the employment shall terminate automatically at the end of the year. Such a clause is of no effect; the school must therefore comply with the sections in question. On the other extreme, we do not suppose anyone would claim that a teacher who substitutes during a regular teacher's illness for three days is anything but a temporary substitute. Between those extreme cases lie instances on one or the other side of the line. In construing the tenure sections, we believe that school administrators should be given reasonable flexibility. On the other hand, we are not disposed to apply the sections so loosely as to permit evasion of the teacher tenure provisions the General Assembly has seen fit to enact.

In this particular case, Fitzgerald may argue that his employment was not "temporary"; it extended from January to June. Again, he may argue he was not a "substitute", because the regular teacher would not be back. Gilliam had resigned, thus the district was not faced with the prospect of two teachers for one job.

On the other side of this case, the district has several arguments. Fitzgerald's period of teaching was not voluntary on the district's part; the district sought and would have employed a certificated special education teacher had one been available, and it did employ such a teacher for the following year. In addition, the intent of all parties concerned was that Fitzgerald's employment was to be for the balance of the year, as disclosed by Davenport's testimony on behalf of the district, Fitzgerald's testimony and his letters, and the state department's permission that Fitzgerald could fill out the year. Fitzgerald's lack of certification for the teaching position he filled is also a factor indicating the temporary nature of the employment. Finally, nothing in the conduct of the district hints that it was trying to evade the teacher tenure law.

■ Upon weighing the considerations pro and con which the parties have presented, we agree with the trial court that Fitzgerald was a temporary substitute. His

employment did not come within sections 279.13 to .19. We thus uphold the judgment.

AFFIRMED.