314 N.W.2d 809 (1981)
Richard A. BERLAND, Petitioner, Respondent,
v.
SPECIAL SCHOOL DISTRICT NO. 1, MINNEAPOLIS, Minnesota, Appellant, and
Elsie EDWARDS, Petitioner, Appellant,
v.
SPECIAL SCHOOL DISTRICT NO. 1, MINNEAPOLIS, Minnesota, Respondent, and
Marshall Garneau, Respondent,
Dale HULME, et al., Plaintiffs,
v.
SPECIAL SCHOOL DISTRICT NO. 1, MINNEAPOLIS, Minnesota, Appellant.
Nos. 50184, 50324, 50555.
Supreme Court of Minnesota.
December 17, 1981.
Rehearing Denied March 23, 1982.
*810 Fredrikson, Byron, Colburn, Bisbee & Hansen and Frederick E. Finch, Minneapolis, for Spec. Sch. Dist. No. 1 (Nos. 50184, 50324 and 50555).
Peterson, Engberg & Peterson, Roger A. Peterson and William F. Garber, Minneapolis, for Edwards No. 50324, and Berland No. 50184.
Dale G. Swanson, Minnesota Elementary School Principal's Assn., Forest Lake, Minn., amicus curiae.
Heard, considered, and decided by the court en banc.
WAHL, Justice.
This is a consolidation of three appeals involving teachers terminated for economic reasons by the Minneapolis Special School District (No. 1) pursuant to the Minnesota Teacher Tenure Act for schools in cities of the first class. Termination was effectuated under Minn.Stat. § 125.17, subd. 4(5) (1980). Richard Berland petitioned the district court for a writ of certiorari to review the termination of his contract by respondent school district. The district court granted certiorari and Berland's motion for summary judgment and ordered that Berland be reinstated with back pay. Elsie Edwards sought a writ of certiorari in the district court to review her contract termination, but her petition was denied. Marshall Garneau brought action for declaratory and injunctive relief to compel the school district to reemploy him in another position within the district following his termination. The district court ordered reinstatement of Garneau with back pay. The school district appeals from the entry of judgment in the Berland and Garneau cases; Edwards appeals for the dismissal of her petition for certiorari. We reverse in the cases of Edwards and Garneau and affirm in the Berland case.
The problems involved in all three cases arose in the summer of 1978, when the Minneapolis School Board decided to discontinue a number of positions in the school district because of budget cuts stemming from declining enrollment. Contracts of the persons who held the discontinued positions were terminated, including the contracts of Berland, Edwards and Garneau. While these teachers do not challenge the necessity of discontinuing the positions, they all claim that their seniority entitled them to retain their positions or to be offered other positions in the school district in preference to teachers who were retained. Each case involves the interpretation of Minn.Stat. § 125.17, subd. 11 (1980), which reads:

Services terminated by discontinuance or lack of pupils; preference given. Any teacher whose services are terminated on account of discontinuance of position or lack of pupils shall receive first consideration for other positions in the district for which she is qualified. In the event it becomes necessary to discontinue one or more positions, in making such discontinuance, teachers shall be discontinued in any department in the inverse order in which they were employed.
We discuss, in order, the issues raised in each appeal.

1. Richard Berland:
Richard Berland is a licensed[1] elementary school teacher and counselor. After *811 serving 6 years as an elementary teacher in other districts and completing a master's degree program in elementary school counseling, Berland was hired by the Minneapolis district in 1974 as an elementary counselor and acquired tenure pursuant to section 125.17, subd. 2, after his 3-year probationary period. He has never taught elementary school classes in the Minneapolis district.
When the district determined in 1978 that it would need to discontinue 12 positions in the counseling department, Berland, one of the 12 least senior counselors, was terminated. He does not dispute the discontinuance of his position as a counselor but contends that section 125.17, subd. 11, entitled him to take the position of, or displace, any less senior teacher whose position he is qualified to fill.[2] It is conceded that elementary teachers less senior than Berland were retained, and he contends that, since he is licensed to teach elementary school, the district was required to offer him one of those positions even though he had not previously held a similar position with the district. The district claims, however, that the elementary counseling department or area is different from the elementary teaching department and that the words "shall be discontinued in any department" in Minn.Stat. § 125.17, subd. 11, preclude any comparison of Berland's seniority as a counselor with that of the district's elementary teachers.
We held in Hendrickson v. Independent School District No. 319, 303 Minn. 423, 228 N.W.2d 126 (1975) that the "position" of a teacher cannot be defined too narrowly. We defined "position" as "that [position] of a teacher at the level and in the curricula for which he is certified * * *," id. at 426, 228 N.W.2d at 128, in Hendrickson's case secondary teacher of social studies and English. As the Berland trial court noted, "a second certification beyond what was currently taught was considered one of his `positions.'" We had previously defined "position" in State ex rel. Ging v. Board of Education, 213 Minn. 550, 7 N.W.2d 544 (1942). There we said "position" was a teacher's "relative place, rank, or standing in the school system." Id. at 585, 7 N.W.2d at 562.[3]Ging was overruled insofar as it referred to elementary teachers in Foesch v. Independent School District No. 646, 300 Minn. 478, 223 N.W.2d 371 (1974). Petitioner in Foesch argued that her "position" was that of a second grade teacher. We found that too narrow a definition and held that positions in elementary schools cannot be classed as primary, intermediate or grammar school divisions. The district's argument in the instant case must be rejected for the same reason we rejected the petitioner's argument in Foesch. The district has attempted to define Berland's position in a fashion too narrow to be acceptable under the definitions of Foesch and Hendrickson.
The school district argues that the statute interpreted in Foesch and Hendrickson referred to schools in cities not of the first class, Minn.Stat. § 125.12, subd. 6b (1980), and that an interpretation of that statute is inapplicable to teacher tenure for schools in cities of the first class. It should be noted that we base our decision here on interpretation of the language in Minn.Stat. § 125.17 and the intent of the legislature in arriving at this language. We refer to Hendrickson and Foesch only insofar as those cases represent this court's view of the legislative intent to protect tenured teachers, either in schools in cities of the first class or those not of the first class.
As long ago as 1938, this court elucidated the legislative purpose behind the teacher tenure act. The language bears repeating:
Plainly, the legislative purposes sought were stability, certainty, and permanency *812 of employment on the part of those who had shown by educational attainment and by probationary trial their fitness for the teaching profession. By statutory direction and limitation there is provided means of prevention of arbitrary demotions or discharges by school authorities. The history behind the act justifies the view that the vicissitudes to which teachers had in the past been subjected were to be done away with or at least minimized. It was enacted for the benefit and advantage of the school system by providing such machinery as would tend to minimize the part that malice, political or partisan trends, or caprice might play. It established merit as the essential basis for the right of permanent employment. On the other hand, it is equally clear that the act does not impair discretionary power of school authorities to make the best selections consonant with the public good; but their conduct in this behalf is strictly circumscribed and must be kept within the boundaries of the act. The provision for a probationary period is intended for that very purpose. The right to demote or discharge provides remedies for safeguarding the future against incompetence, insubordination, and other grounds stated in the act. The act itself bespeaks the intent. Provisions for notice and hearing, the requirements of specified causes for discharge or demotion, are indicative of the general purpose. With these considerations in mind, it is our duty so to construe such parts of the act which on their face do not clearly delineate the legislative intent as will bring about a result in harmony with the expressed legislative policy.
McSherry v. City of St. Paul, 202 Minn. 102, 108, 277, 277 N.W. 541, 544 (1938) (emphasis in original). Cited with approval in Minneapolis Federation of Teachers, Local 59 v. Minneapolis Special School District No. 1, 270 N.W.2d 773, 776 (Minn.1978).
We hold that "position" within the context of Minn.Stat. § 125.17 is that subject area and grade level for which the teacher is qualified as evidenced by licensure from the State of Minnesota. With respect to termination, we believe the legislature intended to protect teachers in cities of the first class to the same extent as those teaching in cities not of the first class. Because the legislature recognized that schools in cities of the first class are more likely to be large enough to be organized into departments, it provided for terminations within departments but continued to allow qualified teachers to take other positions within the district.
The interpretation this court gives to the word "position" does not have the effect, as the school district claims it does, of nullifying the departmental lay-off provision in Minn.Stat. § 125.17, subd. 11. When positions are eliminated due to economic reasons, terminations will be made departmentally, by seniority. Only in the event that the terminated teacher is licensed in another area will the seniority of that teacher be compared to the seniority of the teachers in another department. If the terminated teacher has greater seniority than a teacher retained in a department for which the terminated teacher is qualified, the teacher with less seniority will be "bumped."
The result advocated by the school district, "bumping" not allowed or mandated by the statute, would have the inevitable effect of discouraging teachers from ever pursuing specialized training or attaining multiple licensure. Because the school district could arbitrarily assign the teacher with multiple licenses from department to department, the teacher could never attain enough seniority in any one department to be more senior than teachers who stayed in one department. The multiple-licensed teacher, while experienced and tenured in the school district, could not avoid lay-offs or terminations associated with declining enrollments. To allow school boards such discretion in assignments is inconsistent with the clear intent of Minn.Stat. § 125.17 to retain and tenure experienced teachers.
We are even more strongly persuaded that the cross-departmental "bumping" must be allowed in Berland's case because *813 of the nature of his counseling license. Regulations of the Minnesota Department of Education require that elementary school counselors be licensed to teach in elementary school, have 1 year of successful elementary teaching experience and have a master's degree in counseling before a license for elementary school counseling is granted. 5 MCAR § 3.103A (1978). By definition, then, the elementary counseling department personnel are also qualified to teach in regular elementary classes. In hiring an elementary school counselor, the school board would have before it the teaching record of any applicant. It is unlikely that they would hire a counselor whose teaching record was poor. In this case, Berland had not only 1 but 6 years of successful teaching experience before he was hired by the Minneapolis schools as an elementary school counselor. Berland was an elementary teacher who performed counseling services because of his special education and interest in the area. Similar requirements are made for licensure in other elementary school specialties and administrative positions. Experienced teachers should not be prevented from practicing the general teaching skills for which they are licensed simply because the special area in which they had practiced was the victim of budget cuts and population declines. Berland must be given the benefit of his seniority in the school district by comparing his seniority with that of elementary teachers as well as with that of counseling department personnel. A less senior elementary teacher must be "bumped" so that Berland may move into that position.
The district court is affirmed.

2. Elsie Edwards:
Elsie Edwards is licensed to teach Business and Spanish. As a long-call reserve teacher, she taught five business classes per day at Marshall-University High School from September 2, 1970, to January 24, 1971, and five Spanish classes per day at Southwest High School from January 25, 1971, to the end of that school year. On August 26, 1971, Edwards was hired as a regular contract teacher and since then has held a full-time position as a Spanish teacher in the district's modern languages department. Marcia Hallock, another teacher in the modern languages department, began teaching on December 20, 1970, in a four-tenths, part-time position at University High School. For the next 2 years she remained at the new Marshall-University High School as an eight-tenths, part-time Spanish instructor and thereafter became a full-time teacher in the district.
In 1978, the district decided to discontinue 14 positions in the modern languages department. The board determined that Hallock had greater seniority than Edwards. As a result, Edwards was among the 14 teachers whose contracts were terminated. Edwards contends that her seniority was improperly determined and that the board erred in retaining Hallock instead of Edwards.
Section 125.17, subd. 11, provides that teachers must be terminated "in any department in the inverse order in which they were employed." The district has followed a policy of dating a teacher's employment for purposes of this section from the date the teacher first became a regular contract teacher. Hallock first came under contract in December 1970, and although her position was only part-time, the district calculated her seniority from that date. Edwards, on the other hand, worked for the district full-time as a long-call reserve teacher from September 1970, but did not have a contract until August 1971. Her seniority was computed from the later date. Edwards contends that her employment for purposes of section 125.17, subd. 11, should have included her pre-contract time as a long-call reserve teacher.[4] We agree.
While we have never confronted the question of whether long-call reserve service must be counted toward seniority under *814 section 125.17, subd. 11, Edwards relies heavily upon our decision in Minneapolis Federation of Teachers, in which we concluded in the circumstances of that case that a teacher who had taught in a single long-call reserve position for an entire year was entitled to have the year counted toward her 3-year probationary period for acquisition of tenure.[5] Edwards argues that if long-call reserve experience applies toward tenure, it must apply toward seniority as well. The district responds that tenure is not comparable to seniority and that, therefore, Minneapolis Federation of Teachers is not on point.
Tenure is the right to continue in permanent employment subject to termination only for cause and in compliance with procedural safeguards. Tenure is a status  once it is acquired, each teacher's tenure is equivalent, and one tenured teacher does not inherently have superior rights to another, regardless of years of service. Seniority, on the other hand, gives rise to an additional set of rights, granted by contract or by statute, that do increase with years of service. The district fails, however, to explain why this distinction between tenure and seniority warrants the conclusion that service applied toward the former should not also be applied toward the latter.[6]
We conclude that Edwards' full-time, long-call reserve experience should have been included in the computation of her seniority. Section 125.17, subd. 2, defines the probationary period leading to tenure as the "first three years of consecutive employment." Section 125.17, subd. 11, requires termination "in the inverse order in which the teacher was employed." (Emphasis added.) There is no indication that employment for one purpose is not equivalent to employment for the other. Furthermore, while there is a difference between the ultimate goals of tenure and seniority, it would seem that, contrary to the district's contention, teaching service should be applied more readily toward seniority than toward tenure. The probationary period prerequisite to tenure is an opportunity for the school district to observe and evaluate a teacher's abilities before deciding whether to employ her personally. McSherry, 202 Minn. at 108, 277 N.W. at 544. A school district would have a difficult task of evaluation if a reserve teacher spent her probationary period in a variety of temporary assignments. In contrast, evaluation of the teacher's competence is not a prerequisite to the acquisition of seniority. A seniority system simply reflects the opinion that a teacher with more years of hard work and experience should have greater security than a teacher with fewer years. It therefore seems illogical to ignore Edwards' year of full-time, long-call reserve service while applying Hallock's part-time contract service in computing seniority under section 125.17, subd. 11. Edwards devoted the same time, effort, and commitment and gained equal experience as a regular contract teacher. The school board acted on an erroneous theory of law, and the district court erred in dismissing Edwards' petition for certiorari. Because our holding on this issue is dispositive, we do not consider the other issues raised by Edwards' appeal.
The district court is reversed.

3. Marshall Garneau:
Marshall Garneau is licensed in Minnesota to teach social studies at the secondary *815 level (grades 7-12). He was first employed by the Minneapolis school district in January 1970 as a long and short-call reserve teacher. From January through July 1970, he taught at the Hennepin County Home School for Delinquents in Glen Lake as a long-term substitute. After a semester of short-term assignments in the fall of 1970, Garneau was assigned in January 1971 to Nokomis Junior High School as an itinerant social studies teacher.[7] Since that time he has served in a variety of regular and itinerant junior high school social studies positions, most in traditional classroom settings.
Garneau taught through the 1977-78 school year, at the end of which the district discontinued a number of secondary social studies positions. As one of the least senior teachers in that department, Garneau was terminated pursuant to section 125.17, subd. 11. He contends that he should have then been recalled under the same statute to one of two or three federally funded positions which became available in the fall of 1978. These positions, two in the Comprehensive Employment and Training Act (CETA) Youth Employment Program and one in the Emergency School Aid Act (ESAA) Dropout Prevention Program, involved work with disadvantaged students to promote completion of high school and facilitate the return to school of students who have left.
The district has a dual policy regarding recall of terminated teachers. For positions in the department from which the teachers were terminated, the district recalls qualified teachers in order of seniority, without reapplication by the teachers. However, in filling vacancies for special assignments (nonclassroom positions), the district posts the positions and notifies the terminated teachers individually. Teachers meeting the specified qualifications are invited to apply, and applicants are interviewed and hired upon the recommendation of a screening committee. Seniority, therefore, is not the controlling consideration in such cases.
When the two CETA positions were funded for the 1978-79 school year, the district first assigned two science teachers, James Foster and Jeffrey Holmes, to the positions. In making those assignments, the district followed neither of its recall policies since Foster and Holmes were still under contract. Both Foster and Holmes had less seniority than Garneau, and neither had special qualifications for the positions.
Later, one of the CETA positions again became available. At that point the district recalled Drake Anderson, a teacher who had occupied the CETA job during the spring and summer of 1978 while he was a teacher on itinerant contract with the district. Anderson had originally been assigned the CETA position because he had served for 2 years in the Teacher Corps in a position that involved contact and special training with disadvantaged students. The district did not post the CETA position or seek applications for it, although Anderson may have been recalled strictly on seniority. It is not clear from the record whether he or Garneau is the more senior teacher.
Still later, when a third position was funded (the ESAA position), the district posted the vacancy and solicited applications for it. Kirk Nelson, the teacher who had taught in the CETA program with Anderson during the spring and summer of 1978, was recalled to that position. Although Garneau had more seniority than Nelson, Nelson had 8 years' experience with students who had left or were considering leaving school before the completion of their high school education. Garneau was notified of this position and told how to apply for it; however, he did not apply and was not offered the position.
Garneau contends that he should have been offered one of the three federally *816 funded positions, based on his right of recall under Minn.Stat. § 125.17, subd. 11. Garneau argues that this subdivision establishes an absolute policy of seniority, not only for termination but for recall, and that the district is required to limit its consideration to seniority and teaching licensure. Therefore, the most senior teacher with the requisite license has a right of first refusal without regard to special qualifications. The school district, on the other hand, argues that terminated teachers must be given consideration before other applicants but need not be offered the position if another applicant has superior qualifications.
The district acknowledges at the outset that a "qualified teacher," as defined by section 125.04, is "one holding a valid license * * * to perform the particular service for which he is employed in a public school." Therefore, for purposes of section 125.17, subd. 11, Garneau is "qualified" for the CETA and ESAA positions because he holds the required secondary teaching license and must be given "first consideration" for the positions. The issue to be resolved, then, is the meaning of "first consideration."
The district argues that the term "first consideration" can be interpreted by consulting Black's Law Dictionary, which defines "first" as "[p]receding all others; foremost" and defines "consider" as "[t]o fix the mind on * * * [t]o deliberate about and ponder over." Black's Law Dictionary 571, 277 (5th ed. 1979). The district concludes that the statute requires it simply to evaluate a more senior teacher before considering other applicants but that the district retains discretion, when filling a special position, to reject a more senior teacher in favor of one who has the special qualifications required for that position. The district further maintains that this is, in fact, the procedure which it followed in filling the CETA and ESAA slots.
Garneau arrives at his conclusion that he has a right of first refusal by examining the history of the two separate sentences of the statute in question. The first sentence, which addresses the recall situation, was enacted prior to Ging. In Ging, this court decided that, when reducing its staff because of a decline in enrollment, a school district could terminate senior teachers while allowing junior teachers to remain. Shortly after Ging, the legislature added the second sentence, which requires that a district lay off its teachers in any department in inverse order of seniority. Garneau maintains that this strict seniority provision must also apply to recalls, that it was the intent of the legislature to graft the layoff policy of the second sentence onto the plain meaning of the first sentence.
The trial court determined that section 125.17, subd. 11, was ambiguous and then looked to the legislative history to bolster its conclusion that Garneau should have been offered the CETA and ESAA positions by reason of his seniority. We see no ambiguity in this subdivision, however, and find that the legislative history supports a different conclusion.
While it is clear that the addition of the second sentence shortly after the Ging decision was intended to establish seniority as the basis for determining the order of teacher terminations, we reject Garneau's argument that the amendment established a broad requirement that all employment decisions be handled on the basis of seniority, without the exercise of judgment and discretion on the part of the local board of education. Ging did not involve recall of terminated teachers; and the first sentence of section 125.17, subd. 11, which contains the sole statutory reference to the recall rights of terminated teachers, was not changed by the legislature. In fact, the legislature specifically considered and rejected language that would have provided an absolute right of recall in order of seniority: "Teachers whose positions are so discontinued shall have the right to assignment in any other position in the school system for which they are certified in order of their original appointment."
The quoted language was included in the original text of the bill to amend the subdivision but was rejected by the first Senate *817 committee to consider the bill. A comparison of the rejected language with the language of the first sentence of the subdivision clearly demonstrates that the legislature did not intend that terminated teachers have a right of first refusal in order of seniority. The legislature considered such a change but obviously chose to retain the more flexible requirement of "first consideration."
Furthermore, even if "first consideration" were interpreted to provide for a right of first refusal, nothing in the first sentence of section 125.17, subd. 11, provides for consideration in order of seniority. The sentence gives "any teacher whose services are terminated on account of discontinuance of position" a right to first consideration for other positions. Nothing in the sentence gives Garneau priority by reason of his seniority over Nelson and Anderson, who also were qualified, terminated teachers. To give "any"  that is, each  qualified, terminated teacher a right of first refusal for each available position is impossible. On the other hand, it would be reasonable to provide that each such teacher would receive consideration before applicants who were not terminated pursuant to section 125.17, subd. 4(5).
Examination of the tenure law applicable to districts not in cities of the first class (section 125.12) lends further support to our interpretation. Section 125.12, subd. 6a, provides for negotiated plans for unrequested leave of absence. Districts in which the school board and teachers have not negotiated such a plan are governed by section 125.12, subd. 6b, which provides in pertinent part:
The school board may place on unrequested leave of absence, without pay or fringe benefits, as many teachers as may be necessary because of discontinuance of position, lack of pupils, financial limitations, or merger of classes caused by consolidation of districts. * * * In placing teachers on unrequested leave, the board shall be governed by the following provisions:
* * * * * *
(b) Teachers who have acquired continuing contract rights shall be placed on unrequested leave of absence in fields in which they are licensed in the inverse order in which they were employed by the school district.
* * * * * *
(d) Teachers placed on unrequested leave of absence shall be reinstated to the positions from which they have been given leaves of absence or, if not available, to other available positions in the school district in fields in which they are licensed. Reinstatement shall be in the inverse order of placement on leave of absence. The order of reinstatement of teachers who have equal seniority and who are placed on unrequested leave in the same school year shall be negotiable[.]
These provisions set out in detail the rights of terminated teachers[8] to be reinstated in order of seniority to the positions they formerly held or to other available positions "in fields in which they are licensed," but section 125.12, subd. 13, expressly makes section 125.12 inapplicable to cities of the first class. The difference between the provisions of sections 125.12 and 125.17 demonstrates that the legislature can provide explicitly for terminated teachers to be recalled in order of seniority. The absence of such an explicit provision in section 125.17 strongly suggests that this right of recall was not intended in that section.
We do not find it illogical, as Garneau suggests, that the legislature chose to apply seniority in terminating teachers from positions in which they have established themselves but chose not to extend the application of seniority to the recall of teachers for positions in which they may have had no experience. We have recognized the importance of the discretion vested in the school board to administer the school and to decide who is best suited to fill educational positions. *818 Foesch, 300 Minn. at 485, 223 N.W.2d at 375; Frisk v. Board of Education, 246 Minn. 366, 380-81, 75 N.W.2d 504, 513-14 (1956); Ging, 213 Minn. at 572-73, 7 N.W.2d at 556-67. In this case, the policy reasons for rejecting an absolute right of recall are especially apparent.
Anderson and Nelson possess experience and training for the unique and difficult tasks associated with the CETA and ESAA positions  experience and training which Garneau does not equal. Furthermore, Anderson and Nelson themselves occupied the two CETA positions during the 1977-78 school year. It would seem contrary to wise educational policy to assure Garneau one of these positions simply because of his seniority. In the absence of an express statutory provision, we do not agree with the trial court that educational quality can be so subordinated to seniority.[9] The fact that the federal government requires only a secondary teaching license does not preclude the district from evaluating other credentials of the candidates to insure effective performance in these important alternative educational positions.
Garneau expresses concern that, if the district retains any discretion in the matter of recall, the right of first consideration is illusory. The provision, however, does not accord the district unbridled discretion. The district must be able to show that qualified, terminated teachers were given careful consideration before all other applicants and that a demonstrable reason based upon a comparison of qualifications existed for refusal.[10]
We have some concerns about the arbitrary shifting of two contract teachers into these federally funded positions without first evaluating their special qualifications, but that decision was not governed by the recall statute and is not challenged by Garneau. Since Anderson and Nelson were highly qualified for the positions which became available in October and November, the school board properly exercised its discretion in reinstating them to those positions. However, in this time of declining school populations and restricted budgets, we recognize the opportunities for abuse of discretion in situations such as this and encourage school districts to develop careful and rational procedures for reinstating their teachers to jobs which require special qualifications.
We hold that section 125.17, subd. 11, does not establish an absolute right of recall in order of seniority for terminated teachers and that Garneau was therefore not entitled to the CETA or ESAA positions. The order and judgment of the district court are reversed.
TODD, Justice (concurring specially).
As to Marshall Garneau, I concur with the result.
NOTES
[1] Originally, Minnesota law referred to teacher "certification." This language was changed to "licensure" in 1976. We will use the latter term throughout this opinion, except as to pre-1976 statutes and cases.
[2] The provisions of section 125.17 apply to counselors if licensed as teachers. Minn.Stat. § 125.17, subd. 1(a) (1980).
[3] Minn.Stat. § 125.17, subd. 11, (1980) was amended in 1943 in response to Ging. We note that in 1943 few, if any, elementary school counseling positions existed. The legislature would, of necessity, have been referring to the "departments" that existed at that time only in secondary schools.
[4] The master contract between the parties includes long-call reserve service in the computation of seniority for other purposes, but the contract cannot, of course, govern the legislative intent behind section 125.17, subd. 11.
[5] Section 125.17, subds. 2 and 3, provide, in pertinent part:

Subd. 2. All teachers in the public schools in cities of the first class during the first three years of consecutive employment shall be deemed to be in a probationary period of employment during which period any annual contract with any teacher may, or may not, be renewed as the school board shall see fit.
Subd. 3. After the completion of such probationary period, without discharge, such teachers as are thereupon re-employed shall continue in service and hold their respective position during good behavior and efficient and competent service and shall not be discharged or demoted except for cause after a hearing.
[6] The district contends that its policy of dating seniority from the date of contract is easier to administer and thus fairer to teachers whose rights relative to other teachers are at stake. We note, however, that the definition of seniority in the parties' contracts include long-call reserve service; therefore, the administrative difficulties must not be insurmountable.
[7] Both reserve teachers and itinerant teachers are substitute teachers. A short-call reserve serves on a day-by-day, "on-call" basis. A long-call reserve is assigned to positions where the regular teacher will be gone for some length of time. A long-call reserve is also "on call" and may turn down assignments. An itinerant teacher, on the other hand, is expected to be in constant readiness for assignments and may not decline them. The itinerant teacher is treated as a regular full-time employee of the school district.
[8] Section 125.12, subd. 6b, refers to "unrequested leave of absence" rather than "termination," but the terms are equivalent for our purposes.
[9] A different question would be posed in a case where a terminated teacher seeks to be recalled to a departmental position from which he was terminated. We note that the current district policy provides for recall of teachers to such positions in order of seniority.
[10] The district court concluded that the school district's policy regarding application for reserve teaching positions is reasonable. No appeal is taken from this conclusion.