Barbara KRUETH, et al., Relators,

v.

**INDEPENDENT SCHOOL DISTRICT NO. 38, RED LAKE, MINNESOTA,** Respondent.

No. C6-92-1398.

Court of Appeals of Minnesota.

March 2, 1993.

Review Denied April 20, 1993.

Bruce P. Grostephan, Peterson, Engberg & Peterson, Minneapolis, for relators.

Margaret Treuer, Treuer Law Office, Bemidji, MN, for respondent.

Considered and decided by RANDALL, P.J., and KALITOWSKI and SHORT, JJ.

## OPINION

RANDALL, Judge.

Relators Barbara Krueth, Steven Thompson, Martin Reinke, and Jeffrey Zeller challenge their placement on unrequested leaves of absence by respondent Independent School District No. 38 while other less senior teachers were retained pursuant to respondent's American Indian teacher retention policy under Minn.Stat. § 126.501 (1990). Relators challenge the statute's interpretation, its constitutionality under equal protection and the contracts clause, and its application. Relators also challenge retention of less senior non-Indian teachers for grant-funded positions. We affirm respondent on all issues except the grant-funded position issue, which we reverse.

## FACTS

Relators were tenured teachers in respondent school district. Ordinarily, teachers are placed on unrequested leave of absence in reverse order of seniority under Minnesota's teacher tenure act. Minn.Stat. § 125.12 (1990). Relators were placed on unrequested leave of absence while less senior American Indian teachers were retained under respondent's American Indian teacher retention policy.

An administrative hearing was held on May 13, 1992. The hearing examiner issued findings of fact, conclusions of law, and a recommendation favoring relators. Respondent accepted some of the findings, but rejected other findings, conclusions, and the recommendation of the hearing examiner, and placed relators on unrequested leave of absence while less senior American Indian teachers were retained under re-

spondent's American Indian teacher retention policy.

Respondent's American Indian teacher retention policy, adopted on March 4, 1991, reads in part as follows:

WHEREAS, Minnesota Statute 126.501 permits the Board of Education in placing a teacher on unrequested leave of absence, to retain a probationary teacher or a teacher with less seniority in order to retain an American Indian teacher, notwithstanding the provisions of Minnesota Statute 125.12, subdivisions 4, 6a, or 6b; 125.17, subdivisions 3 and 11, and other laws or contract provisions,

NOW THEREFORE BE IT RESOLVED, that it shall be the general policy of the District, in placing any teacher or teachers on unrequested leave to retain, wherever possible, American Indian teachers pursuant to the above quoted provisions of Minnesota Statute 125.501 [126.501].

In placing any teacher or teachers on unrequested leave of absence the District may retain a probationary teacher or a teacher with less seniority in order to retain an American Indian teacher regardless of the provisions of Minnesota Statute 125.12, subdivision 4, 6a or 6b; 125.17, subd. 3 and 11, or any contract provision.

Relators exercised their right to a hearing. The hearing examiner found the retention policy could only be applied against teachers who had become tenured after May 7, 1988, the effective date of the statute. Since relators had all become tenured before May 7, 1988, the examiner found relators should not have been placed on unrequested leave of absence under the policy. Respondent rejected the examiner's conclusion. Respondent found the May 7, 1988, date limitation of the statute applied to the master contract respondent had with its teachers (including all relators). The master contract (used interchangeably with the term collective bargaining agreement) in this case is dated December 16, 1991. Therefore, respondent found the statute's saving clause did not apply and that respondent had a right to implement the intent of Minn.Stat. § 126.-501 and retain less senior American Indian teachers over more senior non-Indian teachers. Respondent found the retention policy could be applied against all teachers in the district and placed relators on unrequested leave of absence.

Respondent then retained less senior non-Indian teachers with special qualifications for grant-funded positions called Pride Theatre Project and Project Preserve. The examiner found respondent could not rely upon special qualifications and requirements of the funding agency in order to retain less senior teachers who had held these positions over more senior teachers who also had the necessary qualifications. Respondent rejected this conclusion and retained the less senior teachers. There was evidence the funding for these positions might have been withdrawn if the same teachers were not retained for the positions. Relators appeal the hiring preferences respondent used to place them on unrequested leave.

## ISSUES

1. Did the school district err by interpreting the language limiting the application of Minn.Stat. § 126.501 (1990) to "contracts entered into after May 7, 1988" as referring to the teachers' master contract with the school district?

2. Does Minn.Stat. § 126.501 (1990) violate the United States Constitution?

a. Does Minn.Stat. § 126.501 violate the equal protection clause of the Fourteenth Amendment?

b. Does Minn.Stat. § 126.501 violate the contracts clause?

3. Does Minn.Stat. § 126.501 (1990), when applicable, allow only one American Indian teacher per district to be retained?

4. Did the school district err by retaining less senior non-Indian teachers for grant-funded positions when the funding for the positions may have been revoked if those teachers were not retained?

## ANALYSIS

Respondent school district's decision to terminate relators will be set aside only if the decision is

> fraudulent, arbitrary, unreasonable, not supported by substantial evidence on the record, not within the school board's jurisdiction, or is based on an erroneous theory of law.

*Liffrig v. Independent Sch. Dist. No. 442,* 292 N.W.2d 726, 729 (Minn.1980); *State ex rel. Lucas v. Board of Educ. of Ind. Sch. Dist No. 99,* 277 N.W.2d 524, 526 (Minn. 1979).

### I.

*Date of Contract versus Date of Tenure*

The American Indian Education Act of 1988 includes a declaration of policy which provides:

> The legislature finds that a more adequate education is needed for American Indian people in the state of Minnesota. The legislature recognizes the unique educational and culturally-related academic needs of American Indian people. The legislature also is concerned about the lack of American Indian teachers in the state. Therefore, pursuant to the policy of the state to ensure equal educational opportunity to every individual, it is the purpose of sections 126.45 to 126.55 to provide for American Indian education programs specially designed to meet these unique educational or culturally-related academic needs or both.

Minn.Stat. § 126.46 (1990).

As part of this act, the legislature allowed school districts with more than ten American Indian students to retain American Indian teachers with less seniority over other teachers with more seniority. Minn. Stat. § 126.501 (1990) provides:

> This section applies to a school board of a school district in which there are at least ten American Indian children enrolled. The school board shall actively recruit teacher applicants who are American Indian from the time it is reasonably expected that a position will become available until the position is filled or September 1, whichever is earlier. *Notwithstanding section 125.12, subdivision 4, 6a or 6b, 125.17, subdivisions 3 and 11 [the teacher tenure act], any other law to the contrary, or any provision of a contract entered into after May 7, 1988 to the contrary,* when placing a teacher on unrequested leave of absence, the board may retain a probationary teacher or a teacher with less seniority in order to retain an American Indian teacher.

(Emphasis added.) Relators argue the language limiting the application of the act to contracts entered into after May 7, 1988, means any teacher tenured before May 7, 1988, is protected from application of the act. Respondent argues the term "contract" refers to the master contract controlling the school year at issue between relators and the district. Since the master contract here was signed on December 16, 1991, (well after 1988) respondent argues it is entitled to take advantage of the spirit and the letter of section 126.501 and favor less senior American Indian teachers over more senior non-Indian teachers.

Relators [1] point to Minn.Stat. § 125.12, subd. 4 (1990), which provides that teachers have continuing contract rights after they have obtained tenure.

> A teacher who has completed a probationary period in any school district, and who has not been discharged or advised of a refusal to renew the teacher's contract * * * shall have a continuing contract with such district. Thereafter, the teacher's contract shall remain in full force and effect, except as modified by mutual consent of the board and the teacher * * *.

Minn.Stat. § 125.12, subd. 4. Thus, they argue that since tenure is a type of con-

---

**1.** All but one of the relators have been recalled to work at respondent school district. One relator remains on unrequested leave of absence. Even if all relators had been recalled, the issue would not be moot, since the situation is capable of repetition, yet evading review. *See In re Peterson,* 360 N.W.2d 333, 335 (Minn.1984) (citing *Southern Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)).

tract, any teacher who acquired tenure before May 7, 1988, is exempt from the American Indian preference set out in section 126.501.

Respondent argues the "contract" referred to in the statute is the master contract or the collective bargaining agreement covering the teachers for that school year. Since this master contract was entered into after May 7, 1988, the statute applies, according to respondent:

> The provision in Minn.Stat. § 126.501 which permits a school district to place more senior teachers on unrequested leaves of absence in order to retain an American Indian teacher, notwithstanding any provision of a contract entered into after May 7, 1988 refers to the collective bargaining agreement covering the teacher and not the individual contract signed by a teacher at the commencement of teaching in the district. The Board rejects the hearing officer's conclusions * * * and hereby determines that it may retain less senior American Indian teachers while placing more senior non-Indian teachers who acquired continuing contract rights prior to May 7, 1988 on unrequested leave of absence pursuant to Minn.Stat. 126.501 and the District's Indian teacher retention policy. See attached letter from the office of Senator Gary DeKramer [sic], Minnesota Legislature, which is hereby made a part the record herein.

■ Although we agree with respondent, we do not rely on Senator Gary DeCramer's letter in our analysis. Comments regarding legislative intent made after the statute had been passed are inadmissible for the purpose of construing a statute. *See Washington County v. AFSCME*, 262 N.W.2d 163, 167 (Minn.1978); *In re State Farm Mut. Auto. Ins. Co.*, 392 N.W.2d 558, 569 (Minn.App.1986).

■ Respondent properly found that the date limiting clause in section 126.501 referred to the date of the master contract rather than the date of each individual teacher's acquisition of tenure. In *Minnesota Ass'n of Pub. Schs. v. Hanson*, 287

Minn. 415, 423, 178 N.W.2d 846, 852 (1970), the Minnesota Supreme Court found that

> [a]ll contracts of tenure[d] teachers must be construed to incorporate the provisions of the tenure statute in effect *not* at the time the teachers obtained tenure but at the time their contracts were negotiated and signed.

(Emphasis added.) The teachers in *Hanson* had made an argument similar to relators' argument in this case. Since the teachers had obtained tenure prior to the amendment at issue, they argued the amendment did not apply to them. *Id.* at 421, 178 N.W.2d at 851. The court rejected that argument, but recognized the legislature could alter the effect of a change in the teacher tenure laws:

> If the legislature had intended to exempt from the amendment teachers whose tenure had been acquired prior to such amendment, it would have included a savings clause in the amendatory act.

*Id.* at 423–24, 178 N.W.2d at 852. In *Hanson* there was no savings clause. *Id.* at 424, 178 N.W.2d at 853. Here, the savings clause in Minn.Stat. § 126.501 only exempts teachers covered under master contracts entered into before May 7, 1988, not teachers who obtained tenure before that date.

The hearing examiner relied upon *Jurkovich v. Independent Sch. Dist. No. 708*, 467 N.W.2d 360 (Minn.App.1991) in concluding the phrase "contract entered into after May 7, 1988" was a savings clause rendering the statute inapplicable to teachers who acquired tenure before the effective date of the statute, May 7, 1988. We disagree. *Jurkovich* involved a statute which removed superintendents from most applications of the teacher tenure act. *Id.* at 361. The statute only applied to "contracts entered into or modified after July 1, 1990." The superintendent had been employed in that capacity by the school district since 1981. His most recent employment contract was entered into in August 1989. The school district offered him a contract in August 1990, *which he did not sign*. The superintendent chose instead to continue under his existing contract. *Id.*

This court found the statute could not be applied against the superintendent since he had not entered into nor modified a contract after July 1, 1990, because "[a]bsent his execution of a new contract, the old contract is not modified." *Id.* at 362. The date of his employment contract, not the date of tenure, was controlling. *Jurkovich* supports respondent, not relators. The saving clause in *Jurkovich*, similar to that involved in this case, referred to the most recent employment contract, not the date of tenure. Respondent properly interpreted Minn.Stat. § 126.501 to apply to teachers who had obtained tenure before May 7, 1988, as long as the master contract they were working under was signed after that date.

## II.

*Constitutionality*

a. Equal protection

■ Relators also argue Minn.Stat. § 126.501 violates the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.[2] Under equal protection analysis, strict scrutiny is applied to legislatively created classifications if they impermissibly limit a fundamental right or affect a suspect class. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Otherwise, the legislation is subject to review under the rational basis standard. Under this standard, if the classification is rationally related to a legitimate governmental purpose, it does not violate the equal protection clause. *In re Estate of Turner*, 391 N.W.2d 767, 769 (Minn.1986).

■ Strict scrutiny requires the classifications to be necessary or narrowly tailored to a compelling governmental purpose. Strict scrutiny applies to state and local government racial affirmative action cases. *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Wygant v. Jackson Bd. of Educ.*,

476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *see also* 3 Ronald D. Rotunda, John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 18.10 (2d ed. 1992); Laurence H. Tribe, *American Constitutional Law* 1524 (2d ed. 1988). *Contra Metro Broadcasting, Inc. v. Federal Communications Comm'n*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (rational relationship test used for federal affirmative action plan).

■ *Wygant* involved a preference policy for lay-offs, similar to the policy in this case, which allowed minority teachers with less seniority to be retained over non-minority teachers with more seniority. The policy applied to "those employees who are Black, American Indian, Oriental, or of Spanish descendancy." *Wygant*, 476 U.S. at 271 n. 2, 106 S.Ct. at 1845 n. 2. The Supreme Court held that the policy in the collective bargaining agreement, which constituted state action, violated the equal protection clause. *Id.* at 284, 106 S.Ct. at 1852. The Court found the strict scrutiny standard applied, and that the lay-off preference was not specifically and narrowly framed to accomplish a compelling governmental interest.

There was no finding of prior discrimination, and the Court found societal discrimination was not a compelling interest. *Id.* at 276, 106 S.Ct. at 1848; *see also Croson*, 488 U.S. at 497–508, 109 S.Ct. at 723–28. The Court rejected the "role model theory," that minority students need minority teachers as role models, as sufficient grounds for the classifications. *Wygant*, 476 U.S. at 276, 106 S.Ct. at 1848. Finally, the Court noted the distinction between lay-offs and hiring goals in their burden on innocent parties. *Id.* at 282, 106 S.Ct. at 1851. Since less intrusive means such as hiring goals were available, the lay-off preference for minority teachers could not withstand the strict scrutiny standard. *Id.* at 283–84, 106 S.Ct. at 1852.

---

**2.** No State shall * * * deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend 14.

If the strict scrutiny test is applied to this case, respondent's policy is arguably not narrowly tailored and could create a problem. *Wygant* found lay-off preferences too burdensome on innocent parties compared to less intrusive alternatives such as hiring goals. *Id.* at 282, 106 S.Ct. at 1851; *see also Firefighters v. Stotts*, 467 U.S. 561, 574–76, 104 S.Ct. 2576, 2585–86, 81 L.Ed.2d 483 (1984); *Steelworkers v. Weber*, 443 U.S. 193, 208, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979). Also, there is no evidence of prior discrimination against American Indian teachers, which would require a comparison of the racial composition of the teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market. *See Wygant*, 476 U.S. at 275, 106 S.Ct. at 1847. No such comparison was done in this case.

The reason *Wygant* does not control this case in favor of relators is that the policy at issue in *Wygant* did not distinguish between American Indians and the other minorities involved.

If the policy had applied only to American Indians in *Wygant*, the result likely would have been different because the Supreme Court has allowed preferences in employment for American Indians. *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). *Mancari* articulates that preferences for American Indians are not racial but political when the preferences apply to members of federally recognized tribes. *Id.* at 553 n. 24, 94 S.Ct. at 2484 n. 24.

As commentators have noted:

The Supreme Court employs a mere rationality test when scrutinizing tribal classifications because such classifications are viewed as political rather than racial. Laws which give preferential employment or economic benefits to members of American Indian tribes may be upheld on this basis without consideration of whether they constitute a benign

racial classification which might not otherwise survive scrutiny under the equal protection guarantee.

1 Ronald D. Rotunda, John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 4.2 (2d ed. 1992).

*Wygant* and *Mancari* recognize a substantive difference between American Indians and other races. American Indians who belong to a recognized tribe or sovereign entity are a race and, unlike white, black and yellow, are also part of a bona fide political class. Other races are not designated as independent political entities. A preference given to American Indians, although falling heavily on those individuals affected, is neither new nor startling in view of the policy that while race, color, and creed cannot be the basis for discrimination, membership in a political entity can be.[3]

The Court in *Mancari* recognized that a special trust relationship exists between American Indians and the federal government. That relationship allows preference to be given to American Indians in certain situations. *Mancari*, 417 U.S. at 553, 94 S.Ct. at 2484. This has been characterized as the trust doctrine, which provides

[w]hen special or preferential treatment is reasonable and rationally related to the fulfillment of the special trust obligation to Indians, it is permissible differentiation in legitimate public interest rather than prohibited racial discrimination.

*St. Paul Intertribal Housing Bd. v. Reynolds*, 564 F.Supp. 1408, 1410–11 (D.Minn. 1983). The trust doctrine also applies to state action. "State action for the benefit of Indians can also fall under the trust doctrine and therefore be protected from challenge under the equal protection clause or civil rights statutes." *Id.* at 1412 (citing *Washington v. Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (fishing regulations protecting Indi-

---

**3.** The State of Minnesota, like all states, routinely charges nonresidents more money than residents for exactly the same services such as state school tuition, fishing and hunting licenses, et cetera. Residents of other states (we equate a

state to a "tribe" for purposes of analogy), when they come into Minnesota, are bound by our laws yet can neither vote for the lawmakers nor run for office so as to have a voice in those laws.

an treaty rights do not violate equal protection); *Livingston v. Ewing*, 601 F.2d 1110 (10th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 147, 62 L.Ed.2d 95 (1979)).

*Intertribal Housing* involved legislation which provided low cost urban housing for American Indians. *Intertribal Housing*, 564 F.Supp. at 1409–10. The federal district court in Minnesota found the Minnesota legislature's intent to benefit American Indians clearly stated in the legislation, that the preference in urban housing for American Indians was rationally related to the government's unique obligation to American Indians, and that it therefore fell under the trust doctrine and survived an equal protection challenge. *Id.* at 1413. The Minnesota legislature has expressed a similar clear intent to benefit American Indians under the American Indian Education Act with "American Indian education programs specially designed to meet these unique educational or culturally-related academic needs." Minn.Stat. § 126.46.

*Mancari* found the American Indian classifications were not racial but political since they were limited to members of federally recognized tribes. *Mancari*, 417 U.S. at 553, n. 24, 94 S.Ct. at 2484 n. 24; *see also Intertribal Housing*, 564 F.Supp. at 1409 (housing legislation applied to members of federally recognized tribes). The classification must be limited to members of federally recognized tribes, not just people of some American Indian ancestry, otherwise strict scrutiny would apply to limit state racial affirmative action preferences. Minn.Stat. § 126.501 applies to "American Indian teachers." An "American Indian child" is defined as "any child, living on or off a reservation, who is enrolled or eligible for enrollment in a federally recognized tribe." Minn.Stat. § 126.47, subd. 2 (1990). Thus, the reasonable implied definition of an American Indian teacher is any teacher "enrolled or eligible for enrollment in a federally recognized tribe." All the teachers retained by respondent under its policy are enrolled in an American Indian tribe.

The test to be applied to Minn.Stat. § 126.501 for equal protection analysis is the rational basis test. Under the rational basis test, the policy of retaining American Indian teachers in school districts with American Indian students is rationally related to the legislature's stated purposes of improving education for American Indian students and increasing the number of American Indian teachers through education programs designed to meet the unique educational and culturally related academic needs of American Indians.

If section 126.501 has meaning anywhere in the State of Minnesota, it has meaning in Independent School District No. 38, Red Lake, Minnesota. This school district is located entirely on the Red Lake Reservation and consists of a student population almost 100% American Indian. The spirit of the law and the intent of the legislature's designation of policy fits in this school district far stronger than school districts which primarily serve non-Indian students but happen to have at least ten American Indian students in the district. If the law applies to them, it must apply here.

The goals of the American Indian Education Act and the goals of Minnesota's strong teacher tenure laws clash at the Red Lake school district. In a nation with thousands of laws, state and federal, and overlapping jurisdictions, township, school district, city, county, state and federal, it is inevitable that worthy laws, representing worthy interest groups, will meet in an impasse. So it is here. When two rivers meet, one has to yield. The Mississippi absorbs the St. Croix and the Missouri, the Gulf absorbs the Mississippi. We find the American Indian Education Act, with its specific section 126.501, takes precedence over general teacher tenure laws when reconciliation becomes impossible.

b. Contracts clause

Relators also claim application of Minn. Stat. § 126.501 against them is impermissible impairment of their teaching contract. Article I, § 10 of the United States Constitution states that: "No State shall * * * pass any * * * Law impairing the Obligation of Contracts."

■ The Minnesota Supreme Court has found a teacher's continuing contract with a school district may not be constitutionally impaired. *Minnesota Ass'n of Pub. Schs. v. Hanson*, 287 Minn. 415, 423, 178 N.W.2d 846, 852 (1970); *see also* Minn.Stat. § 125.12, subd. 4 (1990). However, a change in the statutes governing continuing contracts does not impair relators' contracts. *Hanson*, 287 Minn. at 422, 178 N.W.2d at 852. Furthermore, even though a teacher has continuing contract rights, those rights are "held to be subject to a proper exercise of the police power of the state * * * for the betterment of the general welfare" without that exercise being an unconstitutional impairment of contractual rights. *Id.* at 424, 178 N.W.2d at 853; *see also Doyle v. City of St. Paul*, 206 Minn. 649, 289 N.W. 784 (1939), *aff'd*, 310 U.S. 615, 60 S.Ct. 1102, 84 L.Ed. 1391 (1940) (reduction of teacher salary by ordinance was not an unconstitutional impairment of contract).

■ The *Hanson* court distinguished *Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685 (1938), where certain school districts were completely removed from the protection of the tenure laws of Indiana. That action was found to be an unconstitutional impairment of contractual rights. In *Hanson*, the court found a change in the statute did not rise to that level of impairment. *Hanson*, 287 Minn. at 424, 178 N.W.2d at 853. This case also involves simply a change in the statutes, not a removal of contractual rights. Moreover, as in *Hanson*, the relators' contract must be construed to incorporate the law at the time their contract was signed, not when they obtained tenure. *Id.* at 423, 178 N.W.2d at 852. Relators' master contract was signed on December 16, 1991, after the effective date of Minn.Stat. § 126.501, and must be subject to the statute. Relators' continuing contract rights under the statutes have changed numerous times since they received tenure. The statute is not an unconstitutional impairment of relators' contractual rights.

## III.

### Number of teachers

■ Relators claim respondent erred by applying the American Indian retention policy to more than one teacher. Relators argue that if the statute applies, it can be applied to favor only one American Indian teacher. Relators argue that since Minn. Stat. § 126.501 reads "when placing a teacher on unrequested leave of absence, the board may retain a probationary teacher or a teacher with less seniority in order to retain an American Indian teacher," it has to be read in the singular. Relators argue that because the statute uses teacher in the singular, only one non-Indian teacher may be bumped, instead of the four teachers respondent bumped. We disagree. It would be patronizing and disingenuous to interpret section 126.501 to mean "one exception, one Indian." Relator's argument is rejected. We can only point out the obvious. The term "teacher" is used so generically throughout the entire body of school law, both as to individual teachers and to teachers as a group, that it simply cannot be found to be singular or plural, as a matter of law, without precise language so stating. The very term that relators rely on is "teacher tenure rights." The term "teacher tenure" rights applies to the tenure rights of an individual teacher and to the rights of teachers as a group. There is no support for respondent's argument that if section 126.501 applies, its application is limited to just one American Indian teacher per qualifying school district per year.

## IV.

### Grant-funded positions

Relators also challenge respondent's decision to retain less senior non-Indian teachers for two grant-funded positions, Pride Theatre Project and Project Preserve. These retentions were not under the American Indian teacher retention policy. Respondent argues its use of hiring preferences is still proper because the agencies funding the positions indicated that the same person must be retained throughout the position's duration or that a person with special qualifications must be re-

tained. We reverse respondent's decision on this issue.

Pride Theatre Project is funded by Blandin Foundation. Roberta Ball was the coordinator of this project, and held a teaching license in English. A teaching license was not required for the position, but a teaching license and college degree were preferred. Respondent retained Ball instead of other more senior teachers because the Blandin Foundation indicated it would withhold grant payments if the same teacher was not retained during the project.

Project Preserve is funded by a discretionary grant from the Minnesota Department of Education Indian Post Secondary Program. Dianne Schwanz was the project coordinator for one year. Another teacher held this position before Schwanz. Schwanz changed the project's job description to meet her qualifications after she took over the job. The state approved the grant for the next year based upon the new job description, and later indicated the grant would be re-evaluated if the same coordinator was not retained. Respondent introduced evidence supporting Schwanz' qualifications for the position.

Relators claim that they, as more senior teachers, had the statutory right to bump Ball and Schwanz from the grant-funded positions. Respondent argues it should not have to place the funding in danger by reassigning the teachers, and points out that school districts are allowed to accept grants and follow their terms. *See* Minn. Stat. §§ 123.40, 465.03 (Minn.1990). Respondent also argues that the Pride Theatre Project is not a teaching position subject to the teacher tenure law since a teaching license is not required for the position.

A teaching license is not required for the Pride Theatre Project position. However, a license requirement is not determinative of whether the tenure laws apply to the position. In *Beste v. Independent Sch. Dist. No. 697*, 398 N.W.2d 58, 62 (Minn.App.1986), this court held that a teacher had the right to bump into a position supervising study halls, even though no license was required, because teachers

had traditionally been assigned to the position. The Pride Theatre Project position is held by a licensed teacher, Roberta Ball. A teaching license and a college degree are preferred under the job description. Respondent did not treat the position as anything other than a tenured teacher position. The tenure law applies to this position.

Respondent also argues that a school district should be allowed to avoid the teacher tenure law if an agency condition for a grant-funded position requires that a certain person be retained for the position. There are no provisions in the teacher tenure law which allow school districts to circumvent the law by agreeing to an outside agency's conditions. The purposes of the teacher tenure law are stability, certainty and permanency of employment and prevention of arbitrary demotions or discharges. *McSherry v. City of St. Paul*, 202 Minn. 102, 277 N.W. 541 (1938). These public policy purposes would not be served by allowing school districts to accept grants which require them to violate teacher tenure law, and then use the grants to justify the violation. While school districts are allowed to accept grants and to abide by the grant's conditions, *those conditions must be lawful.* The teacher tenure law must be followed for the grant-funded positions involved in this case.

Even applying the tenure laws to this case, respondent argues *Berland v. Special Sch. Dist. No. 1*, 314 N.W.2d 809 (Minn.1981), allows consideration of special qualifications for grant-funded positions. However, *Berland* did not involve termination of teachers under Minn.Stat. § 125.12, but recall of teachers under Minn.Stat. § 125.17, subd. 11 (1980). Under subdivision 11, qualified teachers are only entitled to first consideration for positions, whether grant-funded or not. *Id.* at 816. Seniority is not controlling for recall, but it is controlling for termination under Minn.Stat. § 125.12, which is at issue in this case. Similarly, considerations of reasonableness and school board discretion do not apply as they would in realignment cases. *See Strand v. Special Sch. Dist. No. 1*, 361

N.W.2d 69 (Minn.App.1984). This case does not require realignment since only one teacher remains unemployed who could directly bump Schwanz or Ball.

■■■ Before Schwanz wrote the job description for the Project Preserve position, no specific license was required. The teacher in the previous year had a license different from that of Schwanz. As Schwanz wrote the description, a social studies license was required. A qualified teacher is defined as "one holding a valid license." Minn.Stat. § 125.04 (1990). Other requirements may be added for a teacher to be qualified if they are negotiated. *See Blank v. Independent Sch. Dist. No. 16*, 393 N.W.2d 648, 650 (Minn.1986). Otherwise, a school district is not entitled to require other special qualifications for a position other than a license and seniority. *See Beste*, 398 N.W.2d at 62; *Walter v. Independent Sch. Dist. No. 457*, 323 N.W.2d 37, 43 (Minn.1982). The additional requirements for the Project Preserve position were added by Schwanz, and were not negotiated. Respondent may not rely upon these additional special qualifications to justify retaining Schwanz over other more senior teachers.

Neither Project Preserve nor Pride Theatre Project required a specific license for the positions. Therefore, only a valid license is required for a teacher to be qualified for these positions. Relators were all licensed and have seniority. They were qualified for the positions and had the statutory right to bump Schwanz or Ball from their positions. "[C]onsiderations of impracticality and superior ability or qualifications, while laudable, have no place in a bump situation, because a bump is a statutorily mandated procedure." *Beste*, 398 N.W.2d at 62.

All of relators except Jeffrey Zeller have been recalled to full time positions by respondent. Zeller is licensed and has seniority over Schwanz and Ball. Therefore, he should have been allowed to bump the less senior teacher, Ball, from her position, the Pride Theatre Project. Zeller should be reinstated with back pay. *See Westgard v. Independent Sch. Dist. No. 745*, 400 N.W.2d 341, 345–46 (Minn.App.1987) (reversal of unrequested leave placement requires reinstatement plus appropriate back pay), *pet. for rev. denied* (Minn. Apr. 17, 1987).

Although we understand the position of respondent in wanting to please the funding providers, Minnesota's teacher tenure law cannot be abrogated by outside conditions. School districts may not use an agency's conditions in a grant to violate teacher tenure laws.

## DECISION

Respondent properly concluded that less senior American Indian teachers may be retained over relators under Minn.Stat. § 126.501 (1990), when the master contract governing relators employment with respondent was entered into after May 7, 1988.

We affirm respondent's conclusion that Minnesota's American Indian teacher retention policy as expressed in Minn.Stat. § 126.501 (1990) does not violate the equal protection clause or the contracts clause of the United States Constitution.

We also affirm respondent's conclusion that Minn.Stat. § 126.501, when applicable, is not limited to one American Indian teacher per qualifying school district.

We reverse respondent's conclusion that they may rely upon Blandin Foundation's and the Minnesota Department of Education Indian Post Secondary Program's suggested conditions for positions they fund as justification for violating Minnesota teacher tenure law.

Affirmed in part, reversed in part.